OPINION OF THE COURT
 

 Wesley, J.
 

 In 1995, the New York Legislature restored the death penalty to New York’s criminal statutes for the first time since 1984. Although this Court has on several occasions dealt with issues related to the new statute
 
 (see People v Mower,
 
 97 NY2d 239;
 
 People v Edwards,
 
 96 NY2d 445;
 
 Matter of Francois v Dolan,
 
 95 NY2d 33;
 
 People v Couser,
 
 94 NY2d 631;
 
 People v Mateo,
 
 93 NY2d 327;
 
 Matter of Hynes v Tomei,
 
 92 NY2d 613), this case presents the first full appeal of a sentence of death in New York in almost 20 years.
 

 In the early morning hours of December 7, 1996, defendant entered a Brooklyn social club located on 178 Jefferson Avenue. Club 178, also known as Club Happiness, or KPs, is a small neighborhood club. Jerome Sims, Evelyn Davis, Michael Harris, Eddie Brown and Newbry Mitchell — all known to defendant — were in the club at that time. Defendant sat down at the bar and ordered a beer from Jerome Sims, the manager. After
 
 *472
 
 drinking his beer and smoking some cigarettes, defendant went to the bathroom. When he emerged, he spoke to Sims and then, while displaying a gun, announced “You all know what this is. Everybody get on the floor.”
 

 Defendant demanded money from Brown who handed defendant over $200. Defendant directed Sims to approach him. As Sims walked past him, defendant turned and shot Sims in the head at point-blank range. Defendant then shot Michael Harris in the back of his head at close range as he lay behind a table. Defendant turned to Evelyn Davis, fired a shot at her and set his sights on Brown. Defendant shot Brown in the head, seriously wounding him.
 

 Davis escaped the shot unharmed. She begged defendant to let her go, pleading with him “I got five babies.” As Davis tried to run out of the club, defendant stabbed her in the back. Davis struggled, screaming “let me out of here.”
 

 While defendant attacked Davis, Newbry Mitchell escaped out a door leading to the second floor of the club and jammed the door closed behind him. Defendant ran after him and attempted to open the door but soon gave up. Mitchell fled to the second floor. When Mitchell reached a window, he heard the sound of the club’s front door slam shut. Mitchell peered out the window and saw Davis stagger across the street with defendant in close pursuit.
 

 Davis ran to another social club nearby, Club 432, where she appeared breathless with blood coming from her mouth. She entered the club and sat down. When she heard the doorbell, she screamed “No, don’t let him in. That’s him, that’s him. Everybody around the corner is shot. Darrel shot * * * Shirt Man [Eddie Brown], everybody is shot.” No one opened the door. An ambulance arrived and took Davis to the hospital where she was pronounced dead.
 

 Despite his head injury, Brown managed to leave the club. He was discovered by police officers who had stopped a vehicle for a traffic violation nearby. In the meantime, Mitchell, after returning downstairs and seeing the lifeless bodies of Harris and Sims, fled the scene. Defendant was apprehended approximately two weeks later.
 

 Defendant was indicted on six counts of first-degree felony murder, for the deaths of Jerome Sims, Michael Harris and Evelyn Davis, with the robbery of Eddie Brown as the underlying felony for each count (Penal Law § 125.27 [1] [a] [vii]). He was also charged with six counts of first-degree same-
 
 *473
 
 transaction murder (Penal Law § 125.27 [1] [a] [viii]) and several other related offenses. On May 23, 1997, the District Attorney of Kings County filed a notice of intent to seek the death penalty pursuant to CPL 250.40 (2).
 

 Following his arrest defendant gave a number of statements implicating Newbry Mitchell. However, at trial defendant acknowledged sole responsibility for the crimes but contended that his actions were the result of extreme emotional disturbance (Penal Law § 125.27 [2] [a]). Specifically, defendant contended that he suffered from post-traumatic stress disorder related, in part, to alleged abuse and spinal meningitis as a child and the trauma of a prison riot that occurred when he worked as a corrections officer. During the riot, defendant rescued a fellow corrections officer, an act of heroism that earned him a Medal of Honor from the Department of Correction in 1987.
 

 The trial commenced on May 4, 1998 and was completed on May 18, 1998.
 
 [1]
 
 After two days of deliberations, the jury returned a verdict of guilty on six first-degree murder counts, attempted first-degree murder and second-degree criminal possession of a weapon.
 
 [2]
 
 The sentencing determination hearing took another week. After three days of deliberations, the jury sentenced defendant to death. This direct appeal pursuant to article VI, § 3 (b) of the State Constitution and CPL 450.70 (1) followed.
 

 We conclude that defendant’s guilt was established beyond a reasonable doubt and that the verdict was not against the weight of the evidence. We further conclude, as discussed in the ensuing sections, that there was no reversible error in the conduct of the trial, and that the death sentence must be vacated.
 

 I.
 

 Defendant has briefed 28 issues and over 60 sub-issues seeking reversal of his conviction, vacatur of his sentence and other relief. Defendant attacks the constitutionality of the entire
 
 *474
 
 statutory scheme, and claims that his sentence is unconstitutional under
 
 Matter of Hynes v Tomei
 
 (92 NY2d 613).
 

 We begin with the recognition that “death is different”
 
 (see Furman v Georgia,
 
 408 US 238, 306 [Stewart, J., concurring]). The statutory scheme that makes the penalty a possibility imposes many standards and procedures that are different from other criminal proceedings. For our part, the statute confers a unique set of appellate responsibilities on this Court (CPL 470.30). In addition to the powers of an intermediate appellate court (CPL 470.15, 470.20) we are required to review the factual basis for the conviction and the sentence
 
 (see
 
 CPL 470.30 [1], [2]; NY Const, art VI, § 3 [a]). We are also directed to examine whether the death sentence was imposed “under the influence of passion, prejudice, or any other arbitrary or legally impermissible factor including whether the imposition of the verdict or sentence was based upon the race of the defendant or a victim of the crime for which the defendant was convicted” (CPL 470.30 [3] [a]). We must determine whether the death sentence is excessive or disproportionate to the penalties imposed in similar cases (CPL 470.30 [3] [b]) and whether the decision to impose the sentence of death was against the weight of the evidence (CPL 470.30 [3] [c]). By its very nature a capital case requires the most meticulous and thoughtful attention. A mistake discovered years later may not be correctable.
 

 II.
 

 Pretrial Motions
 

 Defendant made several pretrial motions; two need be addressed more fully.
 
 [3]
 

 A. Grand Jury Instructions on Intoxication Defendant moved to dismiss the indictment on a number of grounds. Among them, he contended that the integrity of the grand jury proceeding was impaired when the People refused to give an instruction on intoxication.
 
 [4]
 
 The trial court determined that the instruction was not required in this case
 
 (People v Harris,
 
 174 Misc 2d 654, 656).
 

 
 *475
 
 This Court has determined that a prosecutor is not required to present mitigating defenses to a grand jury
 
 (People v Valles,
 
 62 NY2d 36, 38). We have recognized that the question whether a grand jury should be instructed with regard to a particular defense depends upon its potential for eliminating a needless or unfounded prosecution. Unlike exculpatory defenses, which may result in a finding of no criminal liability, mitigating defenses only reduce the gravity of the offense committed. Thus, while a grand jury instructed on an exculpatory defense might avoid an unwarranted prosecution, the same result would not follow if the grand jury were instructed on a mitigating defense
 
 (id.; see also People v Lancaster,
 
 69 NY2d 20, 29). Like a mitigating defense, intoxication merely reduces the gravity of the offense by negating an element.
 

 We see no reason to depart from Valles.
 
 [5]
 
 The People here were not required to instruct the grand jury on intoxication.
 
 [6]
 

 B. Challenge to the Felony-Murder Provision of Penal Law § 125.27 (1) (a) (vii)
 

 Defendant moved to dismiss the counts of the indictment charging first-degree and attempted first-degree murder under the felony-murder provision of Penal Law § 125.27 (1) (a) (vii). According to defendant, the felony-murder provision irrationally includes some felonies rendering them death-eligible while excluding others.
 

 
 *476
 
 The Supreme Court of the United States has been clear that while states can impose the death penalty there should be a “ ‘meaningful basis for distinguishing the few cases in which (the death penalty) is imposed from the many cases in which it is not’”
 
 (Gregg v Georgia,
 
 428 US 153, 198 [citation omitted];
 
 see Godfrey v Georgia,
 
 446 US 420, 433). The Court has further recognized that a state’s capital sentencing scheme must “ ‘genuinely narrow the class of persons eligible for the death penalty’ ”
 
 (Arave v Creech,
 
 507 US 463, 474 [quoting
 
 Zant v Stephens,
 
 462 US 862, 877]). In accomplishing that result the capital statute must distinguish on a principled basis between those who deserve capital punishment and those who do not
 
 (id.).
 

 The Eighth Amendment does “not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved”
 
 (Gregg,
 
 428 US 153, 175). The decision to authorize capital punishment for classes of crimes is one best left to the Legislature unless clearly wrong. We recognize that the Legislature can determine among the sins of society those that require a criminal sanction, and prescribe the appropriate punishment
 
 (see People v Broadie,
 
 37 NY2d 100, 117). Moreover, “courts may not substitute their judgment for that of the Legislature as to the wisdom and expediency of the legislation”
 
 (People v Davis,
 
 43 NY2d 17, 30,
 
 cert denied
 
 435 US 998,
 
 rearg dismissed
 
 61 NY2d 670).
 

 Defendant contends that the statute fails to include a capital sentence for murders committed in the course of and in furtherance of many felonies that the Legislature has classified as among the state’s most serious crimes
 
 (see e.g.
 
 Penal Law § 105.17 [class A-I first-degree conspiracy]; Penal Law § 220.43 [class A-I first-degree sale of a controlled substance]). Defendant submits that the classification of felony murder is not only underinclusive in that equally serious crimes are treated unequally but it is perverse in treating lesser crimes more harshly than serious ones.
 

 One legislative goal of the 1995 death penalty legislation was to “deal with those crimes which most seriously affect society and the community as a whole” (Mem of State Exec Dept, 1995 McKinney’s Session Laws of NY, at 1781). The Legislature made the assessment that the predicate felonies for first-degree felony murder should be those that are potentially the most violent and involve a substantial risk of physical injury. As one court has noted:
 

 
 *477
 
 “[G]rand larceny in the first degree is a class B felony, yet it is not included in subparagraph (vii), while simple robbery, a lesser grade of offense, is included. Rationally, the Legislature could have concluded that because of its inherently violent nature, robbery regardless of degree should be included, while grand larceny, though a greater offense, should not because it is not inherently violent. Moreover, the Legislature could have concluded that since an intentional killing in the course of a grand larceny — a crime not usually associated with violence — is so unlikely, there would be little deterrent effect in making such an offense death-eligible. By contrast, one might expect a more widespread deterrent effect to result from making intentional killings in the course of violent felonies, such as robbery, subject to the death penalty”
 
 (People v Hale,
 
 173 Misc 2d 140, 158,
 
 mod on other grounds sub nom. Matter of Hynes v Tomei,
 
 237 AD2d 52,
 
 revd
 
 92 NY2d 613,
 
 cert denied
 
 527 US 1015).
 

 The Legislature’s decision to exclude felonies of a similar grade, but lacking the inherent potential for violence and physical injury, was therefore rational.
 

 III.
 

 Jury Selection
 

 Defendant raises seven issues concerning substantive and procedural aspects of jury selection; several merit discussion. As an initial matter, defendant does not challenge the composition of the jury that sat on his case, and makes no claim of bias on the part of any member of that jury.
 

 A. Life/Death Qualification Under CPL 270.20 (1) (f)
 

 Prospective jurors whose views on the death penalty are such that they would be committed, before trial has begun, to vote either for or against the death penalty, regardless of facts that might emerge in the course of the proceedings, are excludable for cause
 
 (see Witherspoon v Illinois,
 
 391 US 510, 522 n 21;
 
 see also Wainwright v Witt,
 
 469 US 412). This process is known as life/death qualification
 
 (see Lockhart v McCree,
 
 476 US 162;
 
 see also Morgan v Illinois,
 
 504 US 719). “Death qualification” ensures that prospective jurors are able to consider
 
 *478
 
 the death penalty; “life qualification” ensures that prospective jurors can consider a life sentence. In New York, CPL 270.20 (1) (f) sets forth the standard and procedure for excluding ineligible jurors.
 
 [7]
 

 Defendant moved to postpone the death qualification process until after the guilt phase of his trial. He argued that death qualification as required by the statute would result in a conviction-prone jury and would disproportionately and unlawfully exclude certain cognizable groups from the venire. The court denied the motion
 
 (People v Harris,
 
 176 Misc 2d 967). Relying on
 
 Lockhart
 
 (476 US 162), the court concluded that the statute did not violate the Federal Constitution and declined to address defendant’s state constitutional claim, deferring that determination to this Court. We conclude that defendant has failed to overcome the presumption of constitutionality with respect to CPL 270.20 (1) (f)
 
 (see Matter of Hynes v Tomei,
 
 92 NY2d 613, 626;
 
 v Davis,
 
 43 NY2d 17, 30).
 

 In
 
 Lockhart
 
 (476 US 162), the Supreme Court of the United States rejected a similar challenge to pretrial death qualification. The Court acknowledged that some social science studies presented to the Court indicated that the removal of jurors who held views against the death penalty could affect guilt determinations, but found “serious flaws” in those studies
 
 (id.
 
 at 168).
 
 [8]
 
 Even assuming that the studies were both valid and adequate to establish that death qualification in fact
 
 *479
 
 produced more conviction-prone juries, the Supreme Court nevertheless concluded that the Constitution did not prohibit the states from “death qualifying” juries in capital cases
 
 (id.
 
 at 173).
 

 In
 
 Lockhart,
 
 the defendant’s Sixth Amendment claim was premised on the contention that the death-qualifying procedure denied him a jury that represented a fair cross-section of the community. The Court noted that it had never invoked the fair cross-section principle to invalidate the use of either for-cause or peremptory challenges, or to require a sitting petit jury — as opposed to a jury panel or venire — to reflect the composition of the community at large
 
 (id.
 
 [citing
 
 Duren v Missouri,
 
 439 US 357, 363-364;
 
 Taylor v Louisiana,
 
 419 US 522, 538;
 
 Batson v Kentucky,
 
 476 US 79, 84-85 n 4]). “The limited scope of the fair-cross-section requirement is a direct and inevitable consequence of the practical impossibility of providing each criminal defendant with a truly ‘representative’ petit jury”
 
 (id.
 
 at 173-174).
 

 Death qualification at the beginning of the trial is designed to serve the state’s “concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial”
 
 (id.
 
 at 175-176). If we took the fair cross-section requirement to its logical extreme, it would inappropriately produce a jury composed in part of individuals who have indicated that they cannot and would not follow a judge’s instructions on the law and would undermine the defendant’s right to an impartial jury
 
 (see Wainwright v Witt,
 
 469 US 412, 424 n 5).
 

 Defendant concedes that
 
 Lockhart
 
 informs our inquiry here. Nevertheless, he maintains that independent state constitutional treatment of the issue requires a contrary result. He suggests that pretrial death qualification nullifies our state’s historic commitment to diversity and nondiscriminatory jury-selection procedures. He also contends that this Court has regularly recognized the significance of a defendant’s right to an impartial jury
 
 (see People v Johnson,
 
 94 NY2d 600, 610;
 
 People v Branch,
 
 46 NY2d 645, 650) and argues that pretrial death qualification undermines this right because the process conditions jurors toward a guilty verdict by requiring them to
 
 *480
 
 assume defendant’s guilt prior to trial. Moreover, he relies on studies that purport to show that the surviving jury is more conviction-prone, possesses pro-prosecution attitudes and is thus poisoned by the process.
 

 Defendant’s challenge is really no different than that made in
 
 Lockhart.
 
 At least one New York court has rejected similar claims by another capital defendant
 
 (see e.g. People v Hale,
 
 173 Misc 2d 140, 189-191). Nothing in the language of the state’s constitutional counterpart of the Sixth Amendment right to a jury trial (NY Const, art I, § 2) or our jurisprudence suggests that defendant is entitled to greater protection here on state constitutional grounds
 
 (see People v McCray,
 
 57 NY2d 542, 550). Defendant also overlooks New York’s history of ensuring that juries are death qualified
 
 (see
 
 former Code Crim Pro § 377 [8]). Thus, we see no state constitutional impediment to CPL 270.20 (1) (f).
 

 We recognize the importance of an impartial jury, but do not agree with defendant’s contention that pretrial death qualification somehow abrogates that right. Defendant’s claim— that the jury
 
 could
 
 have been preconditioned by pretrial qualification — is totally unpersuasive in this case. Defense counsel specifically asked every final panel whether any prospective juror believed that, as a result of the qualification process, defendant was presumed guilty. Not one expressed that opinion.
 

 Defendant does not assert that the studies upon which he relies avoid the flaws noted in
 
 Lockhart.
 
 Rather, he maintains that
 
 Lockhart
 
 “disregarded sound academic principles”— undefined by defendant — by failing to consider the studies collectively. We disagree. The studies provide no solid proof that pretrial death-qualification detrimentally conditions a jury, leads to a more conviction-prone jury or excludes identifiable groups of people.
 

 Furthermore, death qualification does not impair or detract from our well-documented commitment to jury panel diversity or to nondiscriminatory jury selection procedures. As the Supreme Court noted in
 
 Lockhart,
 
 “the Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case” (476 US at 184). The simple fact remains that the State has a valid interest in excluding jurors from a capital trial whose views on
 
 *481
 
 the death penalty (whatever they may be) render them unable to perform their sworn duty to try the entire case free of prejudice.
 

 B. Trial Court’s Jury Selection Procedure
 

 Defendant also contends that the trial court improperly conducted jury selection. He maintains that the trial court erred when it instructed the venire panels on the standards for juror qualification. In his view, the instruction enabled potential jurors to manipulate the outcomes of their voir dires, thus tainting the selection process. In addition, defendant argues that the trial court erred by conducting group voir dire.
 

 During preliminary instructions to the venire panels, the court explained the life/death qualification process. It stressed to the panels that it was looking for jurors who would be open to both available sentencing options after a guilty verdict of murder in the first degree. At first defendant made no specific objection to the instructions. However, defendant ultimately did complain that the court was highlighting the requirements for jury selection to the panels.
 

 To the extent the trial court may have forecast the type of individual who could avoid jury service when it described the life/death qualification process, we do not see the prejudice defendant claims to have suffered in this case. We presume that jurors follow their oaths, answer the questions put to them truthfully and abide by the court’s instructions
 
 (see People v Acevedo,
 
 69 NY2d 478, 488). However, courts should exercise caution in this regard. The way in which a court conducts death/life qualification should encourage honesty and frankness in a juror’s responses without seeming to place a value or reward on a “correct” or “appropriate” answer.
 

 We also reject defendant’s contention that CPL 270.16 (1) requires only individual voir dire in capital cases. CPL 270.16 (1) directs that the court permit the parties on motion “to examine the prospective jurors individually and outside the presence of the other prospective jurors regarding their qualifications to serve as jurors.” CPL 270.15 (1) (c) states that the court shall permit both parties to examine the prospective jurors “individually or collectively” regarding their qualifications to serve as jurors. There is nothing to suggest that in adding CPL 270.16, the Legislature intended to supersede CPL 270.15
 
 (see People v Santiago,
 
 184 Misc 2d 403, 405).
 

 Defendant claims he was prejudiced when the court conducted group voir dire after individually questioning prospec
 
 *482
 
 tive jurors. The panels were asked if they had changed their minds after having a chance to consider their answers in the individual sessions. Defendant contends that because the jurors were “educated” in the individual interviews they could then alter prior answers and escape unwelcome jury service.
 

 Defendant never made any specific objection to the group voir dire procedure; defense counsel only expressed a concern regarding the scope of the questions presented to a group panel on the issue of whether prospective jurors had a change of heart about sitting on a death penalty case. In addition, the record does not indicate that during group voir dire, prospective jurors were pressed further on their views regarding the death penalty. When an individual juror expressed doubt about her ability to convict defendant of first-degree murder, given the uncertainty of the penalty phase, she was asked no further questions about capital punishment.
 
 [9]
 

 C. Standard for Determining When a Juror Should be Excluded Pursuant to CPL 270.20 (1) (f): “Preclude” vs “Prevent or Substantially Impair”
 

 Defendant complains that the trial court applied the wrong standard in determining for-cause challenges during CPL 270.20 (1) (f) life/death qualification. We disagree.
 

 Our analysis begins with the federal standard for juror disqualification in capital cases. In
 
 Witherspoon v Illinois
 
 (391 US 510, 512), the Supreme Court confronted whether an Illinois statute could exclude prospective venirepersons who possessed “conscientious scruples against capital punishment.” The statutory exclusion eliminated nearly half the venire. The Supreme Court noted that the statute produced a jury that fell “woefully short of that impartiality to which the petitioner was entitled under the Sixth and Fourteenth Amendments”
 
 (id.
 
 at 518). While the State had the right to exclude jurors who, despite their oaths, would not be able to impose the death penalty, it crossed “the line of neutrality” when it removed from the jury all who expressed conscientious objections against the death penalty
 
 (id.
 
 at 520). “The most that can be demanded of a venireman in this regard is that he be willing to
 
 *483
 

 consider
 
 all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings”
 
 (id.
 
 at 522 n 21 [emphasis in original]).
 

 Twelve years later, the Court faced a similar conundrum involving a Texas statute that disqualified prospective capital jurors unless they affirmed under oath that the mandatory penalty of death or imprisonment for life would not “affect” their deliberations on any issue of fact. Looking back to
 
 Witherspoon
 
 and several subsequent cases, the Supreme Court noted “a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath”
 
 (Adams v Texas,
 
 448 US 38, 45). The Court recognized that
 
 Witherspoon
 
 did not express a ground for challenging any prospective juror. It limited the State’s power to exclude: “if prospective jurors are barred from jury service because of their views about capital punishment on ‘any broader basis’ than inability to follow the law or abide by their oaths, the death sentence cannot be carried out”
 
 (id.
 
 at 48).
 

 The Texas statute fell directly within the sweep of
 
 Wither-spoon)
 
 unlike exclusion based on noncapital categories (i.e., personal bias), the oath requirement in
 
 Adams
 
 focused on the prospective juror’s beliefs about the death penalty. Moreover, instead of testing the prospective juror’s ability to follow the law or abide by an oath, the statute allowed the exclusion of jurors who were merely “affected” by the death penalty. “[N] either nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court’s instructions and obey their oaths, regardless of their feelings about the death penalty”
 
 (id.
 
 at 50).
 

 In
 
 Wainwright v Witt
 
 (469 US 412), the Supreme Court noted that
 
 Witherspoon
 
 recognized that there are individuals so opposed to the death penalty that their presence on a capital jury “might frustrate the State’s legitimate interest in administering constitutional capital sentencing schemes by not following their oaths”
 
 (id.
 
 at 423). There was “nothing talismanic about juror exclusion under
 
 Witherspoon
 
 merely because it involves capital sentencing juries.
 
 Witherspoon
 
 is not grounded in the Eighth Aanendment’s prohibition against cruel and unusual punishment, but in the Sixth Amendment”
 
 (id.).
 
 The quest is
 
 *484
 
 for “jurors who will conscientiously apply the law and find the facts”
 
 (id.).
 
 Thus, the Supreme Court concluded that the proper standard for determining when prospective jurors may be excluded for cause because of their views on capital punishment is whether a juror’s views would “ ‘prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath’ ”
 
 (id.
 
 at 424). This standard applies both to jurors who may be in favor of the death penalty and to those jurors who may be opposed to it
 
 (see Morgan v Illinois,
 
 504 US 719, 735).
 

 Under CPL 270.20 (1) (f) venire members are excluded for cause when they entertain views either for or against the death penalty that “preclude” them from performing their duties. The term “preclude” is generally defined as “to close” or “to make impossible by necessary consequence: rule out in advance” (Merriam-Webster’s Collegiate Dictionary 915 [10th ed]). Defendant contends that the People should be held to this higher standard, which for him differs markedly from the constitutional standard of “prevent or substantially impair.”
 
 [10]
 

 CPL 270.20 (1) (f) expressly mandates that a single standard be used to challenge prospective jurors who entertain “such conscientious opinions
 
 either against or in favor of
 
 ’ capital punishment (CPL 270.20 [1] [f| [emphasis added]). We understand the word “preclude” to relate to the ability of a prospective juror to perform his or her duty to act impartially and to follow a court’s instructions in accordance with the law and not as a measurement of the strength or sincerity of an individual’s feelings on the death penalty. As the Supreme Court cases tell us, the focus is on the jurors’ ability to serve impartially and not on how the death penalty affects them generally
 
 (see Wainwright,
 
 469 US 412;
 
 Adams,
 
 448 US 38). Thus, the word “preclude” must be understood as an embodiment of the
 
 Wainwright
 
 “prevent or substantially impair” standard.
 

 Where jurors express conscientious views concerning the death penalty yet still make clear that they are able to follow their oaths to act impartially, they cannot be excluded for cause from participating on the jury. But where jurors express an inability to set aside their personal views on the death penalty in deference to the court’s instructions, their judgment is
 
 *485
 
 substantially impaired to a degree that it “preclude [s] [them] from rendering an impartial verdict or from properly exercising [their] discretion” under CPL 400.27 (CPL 270.20 [1] [fl). The trial court applied the appropriate standard for both the prosecution’s and defendant’s for-cause challenges under CPL 270.20 (1) (f).
 
 [11]
 

 D. Defendant’s For-Cause Challenge of Prospective Juror No. 233
 

 Defendant claims that the trial court erroneously denied his for-cause challenge under CPL 270.20 (1) (f) to prospective Juror No. 233, thereby causing him to use a peremptory challenge to remove her from the jury. Because he exhausted all his peremptory challenges before the completion of jury selection, defendant argues he is entitled to a new trial under CPL 270.20 (2). We disagree.
 

 Prospective Juror No. 233 indicated on her questionnaire that she was not certain of her feelings about the death penalty. During individual voir dire she stated that she did not feel that “anybody has a right to judge who dies and who doesn’t.” She did note that her sentence determination would depend on the situation and further stated that while she could vote for the death penalty in this case, she would not necessarily do so. She agreed that she would listen to all the factors that defendant would offer for consideration of the sentence to be imposed. In particular, she indicated that she would want to hear about defendant’s criminal record and life experiences. She then expressed strong skepticism about child abuse as a cause of adult behavior.
 

 Juror No. 233 later indicated that she could consider evidence about trauma a person suffered as an adult, and how it might have affected defendant. Specifically, she noted that she
 
 *486
 
 could take into account defendant’s experiences as a corrections officer, his involvement in protecting another officer’s life during a riot and resulting psychiatric damage. Finally, Juror No. 233 reiterated that she would never automatically vote for the death penalty.
 

 Defendant moved to excuse Juror No. 233 for cause, claiming that “her inability to consider and give any weight to * * * what will be one of the relevant mitigators is the basis to disqualify her [for] cause from serving on the jury.” The court denied the motion, ruling that No. 233’s feelings — that child abuse was merely the favored excuse of the 1990s — were not grounds for her exclusion from the jury. Ultimately, the defense excused her peremptorily. Because defendant exhausted his peremptory challenges before completion of jury selection, we may review the claimed error on this appeal
 
 (see
 
 CPL 270.20 [2]).
 

 CPL 270.20 (1) codifies the grounds upon which a for-cause challenge may be made. Defendant’s challenge to Juror No. 233 was premised solely on CPL 270.20 (1) (f).
 
 [12]
 
 While Juror No. 233 did not express any strong opinion either for or against the death penalty, she did indicate she was skeptical of child abuse and its subsequent effect on an adult’s behavior. But No. 233 was never asked if her uncertainty would affect her views on the death penalty in general or in its application to this case after a jury verdict of capital murder. Critically, No. 233 was never asked if despite her doubts concerning the significance of child abuse evidence she could still vote to give defendant life without parole.
 

 CPL 270.20 (1) (f) is specifically directed at a potential juror whose
 
 views concerning the death penalty
 
 preclude the juror from serving during either stage of a capital trial. Thus, the statute anticipates a connection between the juror’s attitude
 
 *487
 
 regarding a mitigator and its effect on that juror’s consideration of the appropriate sentence. Defendant made no correlation between Juror No. 233’s views on child abuse and her views on the death penalty or her ability to exercise sentencing discretion conferred by statute. Thus, defendant has failed to make a claim that his for-cause challenge against Juror No. 233 pursuant to CPL 270.20 (1) (f) should have been granted.
 
 [13]
 

 IV.
 

 Guilt Phase
 

 We part company with our dissenting colleague on only two error claims identified in defendant’s 779-page main brief.
 
 [14]
 
 As noted above, we do not share his legal analysis of the chal
 
 *488
 
 lenge to prospective Juror No. 233. In addition we disagree with his conclusion that the trial court committed reversible error during the guilt phase of the trial. However, three trial rulings merit discussion.
 

 A. Trial Court’s Preclusion of Defendant’s Rebuttal
 

 Defendant argues that the trial court erred in precluding the rebuttal testimony from a defense expert witness. Defendant contended at trial that he acted under extreme emotional disturbance due, at least in part, to post-traumatic stress disorder. Defendant retained two mental health experts: Dr. H. Westley Clark, a psychiatrist and expert in post-traumatic stress disorder, and Dr. Sanford Drob, a forensic psychologist who administered a battery of psychological tests to defendant. The prosecution, in turn, retained Dr. Daniel Martell, a forensic psychologist who also tested defendant extensively.
 

 Clark noted that he had reviewed Drob’s tests and Martell’s report. Indeed, during his direct testimony, Clark continually referred to the tests performed by both Drob and Martell. However, Clark conceded early in his direct testimony that the psychological testing did not adequately address post-traumatic stress disorder. Rather, Clark indicated that his diagnosis of post-traumatic stress disorder ultimately was based on his own clinical evaluation.
 

 During Clark’s direct examination, defense counsel asked him to comment on the differences between his report and its conclusions and that of Martell, who had not yet testified. The prosecution objected and the court ruled that defendant could not ask Clark questions that anticipated Martell’s testimony. Later, during a scheduling break, defense counsel expressed uncertainty whether Clark or Drob would be brought back to rebut Martell’s testimony. According to defense counsel, that decision would depend on Martell’s testimony. Following Clark’s testimony, the defense did not call Drob.
 

 Drob listened to Martell’s testimony. Martell stated that based on his tests and some of Drob’s, he could not conclude that defendant suffered from post-traumatic stress disorder. Defendant cross-examined Martell on his conclusions. After Martell’s testimony, defendant sought to call Drob as a rebuttal witness to refute Martell’s findings with specific reference
 
 *489
 
 to certain psychological tests.
 
 [15]
 
 The prosecution objected and defense counsel made a proffer.
 

 In New York, “[t]he rules concerning the proper scope of rebuttal evidence are clear. The party holding the affirmative of an issue must present all evidence concerning it before he closes his case. Thereafter, that party may introduce evidence in rebuttal only”
 
 (People v Harris,
 
 57 NY2d 335, 345;
 
 see also
 
 Fisch, New York Evidence § 326, at 211 [2d ed 1977]). Rebuttal evidence is limited to evidence in denial of an assertion of a new affirmative fact or other new matter which the opponent has endeavored to prove in reply to the case-in-chief
 
 (see Harris,
 
 57 NY2d at 345). In some instances, rebuttal evidence may also be used for impeachment purposes
 
 (see id.; Ankersmit v Tuch,
 
 114 NY 51). Notably, at trial, defendant did not contend that Drob’s testimony should be received to impeach Martell’s credibility.
 

 The opportunity to present rebuttal, however, does not permit a party to hold back evidence properly part of the casein-chief and then submit that evidence to bolster the direct case after the opponent has rested
 
 (see e.g.
 
 Prince, Richardson on Evidence § 6-504, at 441 [Farrell 11th ed 1995]). The limitation on rebuttal evidence is to avoid “first, the possible unfairness to an opponent who has justly supposed that the case in chief was the entire case which he had to meet, and second, the interminable confusion that would be created by an unending alternation of successive fragments of each case which could have been put in at once in the beginning” (6 Wigmore, Evidence § 1873, at 672 [Chadbourn rev 1976]). Even where evidence is not technically of a rebuttal nature and more properly a part of the party’s direct case, however, a court has discretion, in the interest of justice, to allow its admission on rebuttal pursuant to CPL 260.30 (7)
 
 (see Harris,
 
 57 NY2d at 345-346;
 
 see also People v Alvino,
 
 71 NY2d 233, 247-248).
 

 Defendant bore the burden of establishing that he suffered extreme emotional disturbance at the time of the killings. In that regard, Clark testified that defendant suffered from post-traumatic stress disorder. His diagnosis was premised, in part, upon neurological deficits, revealed in Drob’s and Martell’s neuropsychological testing of defendant. Clark believed those deficits rendered defendant vulnerable to traumatic stress. In
 
 *490
 
 reply, Martell testified that defendant did not have a serious neuropsychological dysfunction that made him especially susceptible to post-traumatic stress disorder. Martell utilized tests conducted by Drob and himself for his conclusion. Martell was asked on cross-examination why he had omitted certain tests performed by Drob. Martell did not dispute the validity of those tests in assessing defendant’s neuropsychological dysfunction; he simply chose to employ others.
 

 Drob’s proposed rebuttal testimony disagreed with Mar-tell concerning the significance of tests both had performed, and Martell’s conclusion that defendant did not suffer any significant neuropsychological impairments. Drob did not challenge Martell’s testing methods or the results, only their significance. In essence then, Drob’s opinion as to the tests was no different than Clark’s — both relied on the same data. Thus, virtually all of Drob’s proffered testimony was cumulative to, and corroborative of, the evidence presented on defendant’s case-in-chief on the affirmative defense.
 

 CPL 260.30 (7) vests the trial court with discretion to act as the gatekeeper of rebuttal requests. Because the proposed rebuttal was both cumulative to, and duplicative of, evidence already presented on defendant’s direct case, with only the same relevancy, it was within the trial court’s discretion to disallow the presentation of that evidence on rebuttal. This was a lengthy trial in which two experts testified extensively about defendant’s mental and emotional state. We are careful to note, however, that capital trial courts should exercise great caution in making discretionary determinations such as this. The stakes are high for all involved.
 

 B. Testimony by the Family Members of the Victims
 

 Prior to the People’s case, defendant moved to limit the testimony of some of the victims’ family members.
 
 [16]
 
 The People submitted that their testimony would focus mainly on the identification of the victims. Nevertheless, Detria Davis, Rosalyn Harris and Moses Sims supplied personal details about the murder victims and their families.
 

 The admission of this type of evidence is problematic. We have long held that testimony about victims’ personal back
 
 *491
 
 grounds that is immaterial to any issue at trial should be excluded
 
 (see People v Miller,
 
 6 NY2d 152;
 
 People v Caruso,
 
 246 NY 437). The testimony here is indistinguishable from that in
 
 Miller
 
 and
 
 Caruso.
 
 Although family information about a victim is an important aspect of the victim’s life, generally, it has no bearing on defendant’s guilt or innocence. We are not unmindful of a prosecutor’s desire to convey to the jury the seriousness of the loss of a life. However, our case law is clear that testimony of this type should not be used for that purpose.
 

 After all the victims’ family members had testified, defendant moved unsuccessfully to strike that testimony insofar as it went beyond identification of the victims. Defendant now contends that the admission of this testimony violated his rights to a fair trial and due process. However, by not objecting earlier, defendant deprived the trial court of the opportunity to avoid the error
 
 (see People v Luperon,
 
 85 NY2d 71, 77-78). Thus, the constitutional claims are arguably unpreserved. To the extent that defendant’s claims may be preserved, we conclude that the error was harmless beyond a reasonable doubt in light of the overwhelming evidence of defendant’s guilt
 
 (see People v Crimmins,
 
 36 NY2d 230, 237).
 
 [17]
 

 C. Improprieties During the Prosecutor’s Summation
 

 Of defendant’s numerous claims of prosecutorial misconduct during summation, only one requires discussion — the prosecutor’s references to defendant allegedly having smiled during the testimony of two witnesses.
 
 [18]
 
 During the prosecutor’s examination of Detective Whiteside, the prosecution asked the
 
 *492
 
 detective if the “smile that the defendant is giving you now” was the same smile that defendant purportedly gave the detective shortly before his arrest. The trial court sustained defense counsel’s objection. The prosecutor then asked Whiteside when “you just looked at the defendant now, did he make an expression towards you?” Over defense counsel’s general one-word objection, the detective was allowed to reply “A smirk.”
 

 On summation, the prosecutor stated, “Angie Brown. Do you think it was fun for her to come in here and testify through the tears? To identify this defendant who, as he did with Detective WThiteside, smiled at her.” The trial court overruled defense counsel’s single-word objection to the statement.
 

 We have recognized that admitting evidence of a smile as circumstantial evidence of consciousness of guilt is error
 
 (People v Basora,
 
 75 NY2d 992, 994). “A smile * * * can convey many different states of mind — for example, relief, bewilderment, nervousness, exasperation or happiness”
 
 (id.).
 
 Though not reversible error here, this type of evidence is of questionable and limited probative value; we caution against its admission.
 

 Defendant now contends that the prosecutor’s summation statements concerning defendant’s court demeanor violated his constitutional rights against compelled self-incrimination, to due process, to a fair jury trial, and to confront those who testify against him (US Const 5th, 6th, 8th, 14th Amends; NY Const, art I, §§ 5, 6). Here, defendant’s single-word objections to the smile/smirk statements fell far short of apprising the court of the constitutional claims he now raises on appeal. Moreover, defendant’s motion to set aside the verdict based on this conduct does not cure his failure to register a specific objection
 
 (see
 
 CPL 330.30 [1];
 
 see also People v Padro,
 
 75 NY2d 820, 821). Even if we were to review these claims in the interests of justice
 
 (see
 
 CPL 470.30 [1];
 
 see also
 
 CPL 470.15, 470.20) we would find that the error was harmless beyond a reasonable doubt
 
 (see Crimmins,
 
 36 NY2d at 237).
 

 D. The Trial Court’s Instructions
 

 Defendant contends that the trial court’s unanimity instructions on the affirmative defense of extreme emotional disturbance and its refusal to poll the jurors individually on their
 
 *493
 
 verdict regarding the affirmative defense created the possibility that defendant was convicted of first-degree murder notwithstanding that one or more of the jurors found that he had established extreme emotional disturbance.
 
 [19]
 

 The verdict sheet used in this case required the jury first to determine whether the prosecution had proven beyond a reasonable doubt defendant’s guilt for counts one through eight of the indictment (charging murder in the first degree, attempted murder in the first degree and attempted murder in the second degree). If the jury found defendant guilty on any one of those counts, it was to proceed to Question A which asks: “Did the defendant establish the affirmative defense of extreme emotional disturbance?” The jury was required to check “yes” or “no.”
 

 Near the end of its deliberation instructions, the trial court reminded the jury that its job was:
 

 “to go through this verdict sheet and attempt to reach a verdict on each of the counts submitted to you and to follow the instructions on the verdict sheet. * * *
 

 “I’m going to send you into the juryroom in a few. minutes to start your deliberations.
 
 The goal of this process is an unanimous verdict.
 
 You should, therefore, attempt to reach such a verdict.
 

 “You may well find that you differ among yourselves.
 
 You should, therefore, make every effort to harmonize your various views so that you can come to an unanimous agreement as to the facts of this
 
 case” (emphasis supplied).
 

 During the second day of the guilt-phase deliberations, the jury issued a note asking the court to “review the criteria for extreme emotional disturbance” and asking whether “a unanimous vote [is] required on the question ‘A’ re the establishment of extreme emotional disturbance by the defense.” The court re-read its extreme emotional disturbance charge and then told the jury, “[t]he answer to question 2, is a unanimous verdict required, is yes.”
 

 
 *494
 
 When the jury returned from deliberations, the foreperson announced that the jury had reached a verdict and that the verdict was unanimous in all respects. The jury found defendant guilty on counts one through seven. The foreperson was then asked how the jury answered Question A. The foreperson indicated that the jury had answered that question in the negative, thus rejecting defendant’s affirmative defense. Each of the jurors was asked if the verdict announced by the foreperson was their verdict in all respects. Each responded “yes.”
 

 Under the circumstances here, we conclude that the trial court’s instruction was sufficient to convey the need for unanimity with respect to the issue of extreme emotional disturbance.
 
 [20]
 
 The question asked of the jury on the verdict sheet to which both sides subscribed — whether defendant established the affirmative defense of extreme emotional disturbance — could only be answered yes or no.
 

 Prior to deliberations, the jury was instructed that the goal of the process was a unanimous verdict. They were told that they needed to come to a unanimous agreement as to the facts of the case. When the jury inquired whether it had to be unanimous in answering the question on the affirmative defense, they were told, in no uncertain terms, “yes.” Finally, when each individual juror was polled to ascertain whether the verdict announced by the foreperson was their verdict in all respects, each juror stated “yes.” Thus, we conclude that, taking the trial court’s instructions, supplemental instructions and the polling into consideration, the jury reasonably understood that its decision with respect to defendant’s affirmative defense required unanimity.
 

 V.
 

 The Death Sentence
 

 In
 
 United States v Jackson
 
 (390 US 570), the United States Supreme Court struck down the death penalty provision of the Federal Kidnaping Act. The Act authorized the death penalty only on the recommendation of the jury while a defendant convicted of the same offense through a guilty plea or a non-
 
 *495
 
 jury trial escaped the threat of capital punishment. Under the Act, “the defendant who abandons the right to contest his guilt before a jury is assured that he cannot be executed; the defendant ingenuous enough to seek a jury acquittal stands forewarned that, if the jury finds him guilty and does not wish to spare his life, he will die. * * * The inevitable effect of any such provision is, of course, to discourage assertion of the Fifth Amendment right not to plead guilty and to deter exercise of the Sixth Amendment right to demand a jury trial”
 
 (id.
 
 at 581). Thus, the Act “needlessly” encouraged guilty pleas and jury waivers
 
 (id.
 
 at 582). According to the Supreme Court, “[wjhatever the power of Congress to impose a death penalty for violation of the Federal Kidnaping Act, Congress cannot impose such a penalty in a manner that needlessly penalizes the assertion of a constitutional right”
 
 (id.
 
 at 583).
 

 After
 
 Jackson,
 
 the Court noted that an otherwise valid plea under a Jackson-defective statute was not involuntary merely because it was motivated by defendant’s desire to avoid the death penalty
 
 (see Parker v North Carolina,
 
 397 US 790;
 
 Brady v United States,
 
 397 US 742;
 
 see also People v Edwards,
 
 96 NY2d 445). Nevertheless, while a guilty plea would be upheld, “[i]t may be that under
 
 United States v. Jackson
 
 * * * it was unconstitutional to impose the death penalty under the statutory framework which existed * * * at the time of [the] plea”
 
 (Parker,
 
 397 US at 794-795). Three years later, in a series of cases, the Supreme Court reversed the death sentences of defendants who had gone to trial under statutory schemes that ran afoul of
 
 Jackson
 
 and remanded them for resentencing
 
 (see Funicello v New Jersey,
 
 403 US 948;
 
 Childs v North Carolina,
 
 403 US 948;
 
 Atkinson v North Carolina,
 
 403 US 948;
 
 Hill v North Carolina,
 
 403 US 948;
 
 Roseboro v North Carolina,
 
 403 US 948;
 
 Williams v North Carolina,
 
 403 US 948;
 
 Sanders v North Carolina,
 
 403 US 948).
 

 In keeping with
 
 Jackson,
 
 this Court in
 
 Matter of Hynes v Tomei
 
 (92 NY2d 613), struck the post-death-notice plea bargaining provisions of the death penalty statute as unconstitutional (CPL 220.10 [5] [e]; 220.30 [3] [b] [vii]). Those provisions allowed different penalties for the same offense “imposing death only on those who assert innocence and proceed to trial”
 
 (Hynes
 
 at 620 [citation omitted]). We concluded that “‘a procedure which offers an individual a reward for waiving a fundamental constitutional right, or imposes a harsher penalty for asserting it, may not be sustained’ ”
 
 (id.
 
 at 621-622). Only those defendants who exercised their Fifth and Sixth Amend
 
 *496
 
 ment rights to a jury trial put themselves at risk of death
 
 (see id.
 
 at 623).
 

 The People and the Attorney General urge us to review
 
 Hynes
 
 and “modify” our holding to restore the sections we declared unconstitutional. Neither offers a new argument for a different result. Both acknowledge that if
 
 Hynes
 
 remains the law, defendant’s death sentence must be vacated. All seven of us have concluded that there is no reason to retreat from Hynes; all of us agree that the statute at the time of defendant’s trial impermissibly discouraged defendant’s assertion of his Fifth and Sixth Amendment rights. Accordingly, the trial court could not constitutionally impose the sentence of death on this defendant. The appropriate remedy is to vacate his death sentence and to remit his case to Supreme Court pursuant to CPL 470.30 (5) (c) for resentencing in accordance with Penal Law §§ 60.06 and 70.00 (5).
 
 [21]
 
 In light of that determination, we decline to comment on the propriety of the sentencing proceedings at this juncture.
 
 [22]
 

 Finally, defendant urges that we address the issue whether the entire death penalty scheme is unconstitutional pursuant to the State Constitution’s Cruel and Unusual Punishment Clause (NY Const, art I, § 5). The People claim that defendant’s inability to demonstrate any as-applied harm necessarily precludes him from bringing a facial challenge
 
 (see People v Parker,
 
 41 NY2d 21, 24;
 
 People v Drayton,
 
 39 NY2d 580, 586). Defendant, on the other hand, relies on various Supreme Court cases including
 
 Gregg v Georgia
 
 (428 US 153) and notes that the Supreme Court examined facial claims irrespective of the defendants’ lack of an as-applied challenge
 
 (see also Proffitt v Florida,
 
 428 US 242, 247;
 
 Jurek v Texas,
 
 428 US 262, 268).
 

 Despite the success of defendant’s
 
 Jackson
 
 challenge to his sentence, his conviction remains. Defendant’s situation is distinguishable from the petitioners in
 
 Gregg, Proffitt
 
 and
 
 Jurek,
 
 who were not sentenced under
 
 Jackson
 
 - violative statutory
 
 *497
 
 schemes and were facing the death penalty. Because the disposition of this constitutional issue is not necessary to this appeal, we need not decide it at this time
 
 (see People v
 
 Carcel, 3 NY2d 327, 330).
 
 [23]
 

 The judgment of Supreme Court should therefore be modified by vacating the sentence and remitting to Supreme Court for resentencing in accordance with CPL 470.30 (5) (c) and Penal Law §§ 60.06 and 70.00 (5) and, as so modified, affirmed; the appeal from Supreme Court’s order dated June 10, 1999 should be dismissed as academic.
 

 Smith, J. (concurring in part and dissenting in part). I agree with the majority insofar as it holds that defendant’s sentence of death was unconstitutional because it resulted from a conviction under a statutory scheme violative of his Fifth and Sixth Amendment rights. In addition, I would reverse the conviction, primarily because of three trial court rulings — the denial of defendant’s motion for heightened scrutiny, at least as it applied to issues affecting the sentence, the refusal to permit rebuttal to the testimony of a prosecution witness, and the failure to grant defendant’s motion to exclude a prospective juror for cause.
 

 Heightened Scrutiny in All Stages of a Capital Case
 

 Although the Supreme Court has found that the death penalty is not per se unconstitutional, the Court has consistently proclaimed the truism that death is a different type of penalty. Death is different primarily in its severity and irrevocability
 
 (see Furman v Georgia,
 
 408 US 238, 306 [1972] [Stewart, J., concurring]). Because of this difference, the determination that death is the appropriate punishment involves a “heightened ‘need for reliability’ ”
 
 (see Caldwell v Mississippi,
 
 472 US 320, 340 [1985], quoting
 
 Woodson v North Carolina,
 
 428 US 280, 305 [1976] [plurality op]).
 

 By motion, defendant requested the trial court to apply “heightened scrutiny and a heightened standard of due process throughout all of the proceedings in this capital case.” The People opposed the motion, arguing that “it is well-settled that
 
 *498
 
 a capital defendant is not entitled to greater rights at all stages of a prosecution on the ground that ‘death is different.’ ” The court denied the motion, finding that neither this Court nor the United States Supreme Court “ha[s] required the application of such a broad elevated across-the-board standard.”
 
 [1]
 

 On appeal here, the People argue that the fact that death is different requires heightened reliability only at the sentencing stage.
 
 [2]
 
 ******009The People’s limitation of heightened reliability to the
 
 *499
 
 sentencing stage, however, is inconsistent with the Supreme Court’s evolving death penalty jurisprudence, which makes clear that regardless of when in the proceedings the issues arise, a trial court’s resolution of some issues affecting the guilt determination, as well as the sentencing determination, must comply with the heightened reliability standard
 
 (see Caldwell v Mississippi,
 
 472 US at 340;
 
 Beck v Alabama,
 
 447 US 625 [1980]).
 

 Initially, the Supreme Court’s concerns centered primarily on the procedures under which the death sentence is imposed. In
 
 Furman,
 
 the Court held that the death penalty in the cases before it violated the Eighth and Fourteenth Amendments. In
 
 Gregg v Georgia
 
 (428 US 153 [1976]), the Court identified one of several safeguards that addressed the arbitrary and capricious imposition of the death penalty: a “bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information”
 
 (id.
 
 at 195). While the Georgia death penalty statute reviewed in
 
 Gregg
 
 satisfied the
 
 Furman
 
 concerns, the death penalty statute of North Carolina reviewed in
 
 Woodson v North Carolina
 
 (428 US 280), which mandated the imposition of the death sentence upon a guilty finding, did not. The Court found that
 

 “in capital cases the fundamental respect for humanity underlying the Eighth Amendment, see
 
 Trop v. Dulles,
 
 356 U.S., at 100, 78 S.Ct., at 597 (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a
 
 *500
 
 constitutionally indispensable part of the process of inflicting the penalty of death.
 

 “This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case” (428 US at 304-305).
 

 Consequently, the rights of a capital defendant are greater than those of a noncapital defendant at the sentencing stage. In fact, a capital sentence proceeding is treated like a trial for purposes of double jeopardy
 
 (see Bullington v Missouri,
 
 451 US 430, 438 [1981];
 
 Monge v California,
 
 524 US 721, 725 [1998]). In addition, the sentencer in a capital case must consider virtually all of the defendant’s mitigating factors
 
 (Lockett v Ohio,
 
 438 US 586, 603-605 [1978];
 
 Eddings v Oklahoma,
 
 455 US 104 [1982]). Aggravating circumstances must be proven beyond a reasonable doubt
 
 (Lewis v Jeffers, 497
 
 US 764 [1990];
 
 see also Ceja v Stewart,
 
 97 F3d 1246 [9th Cir 1996]).
 

 In
 
 Gardner v Florida
 
 (430 US 349 [1977]), the Court found that defendant’s right to due process was violated when he was sentenced to death based on information that was not disclosed to him, and thus, he had no opportunity to explain or deny. The Court rejected the holding of an older similar case which was decided at a time when the death sentence was perceived as no different from any other sentence.
 
 [3]
 

 The Court has applied heightened reliability to the selection of jurors, who under most death penalty statutes, including
 
 *501
 
 New York’s, determine whether defendant is guilty or not, and if guilty, whether the death sentence is appropriate
 
 (see Lockhart v McCree,
 
 476 US 162, 182 [1986] [citing
 
 Witherspoon v Illinois,
 
 391 US 510, 519 (1968)]).
 
 [4]
 
 In
 
 Turner v Murray
 
 (476 US 28 [1986]), the Court found the lower court’s failure to question prospective jurors on racial bias violated the defendant’s right to an impartial jury under the Sixth and Fourteenth Amendments.
 
 [5]
 
 Before
 
 Turner,
 
 lower courts relied on
 
 Ristaino v Ross
 
 (424 US 589 [1976]), in which the Court stated that the Constitution did not necessarily require trial courts to question jurors on racial bias simply because the defendant was black and the victim white. The
 
 Turner
 
 Court distinguished
 
 Ristaino
 
 because it was not a capital case, and concluded that in capital proceedings involving an interracial crime, upon defendant’s request, trial courts must inform prospective jurors of the race of the victim and must conduct voir dire on the issue of racial bias
 
 (see Turner,
 
 476 US at 35-36). Because the trial court failed to conduct such voir dire below, the
 
 Turner
 
 Court vacated the death sentence, but left the conviction undisturbed.
 

 In
 
 Morgan v Illinois
 
 (504 US 719 [1992]), the trial court denied defendant’s request to ask jurors whether they would automatically vote for the death penalty, reasoning that the court had asked essentially the same question when it inquired whether each member of the empaneled jury could be fair and impartial and when it asked most jurors whether they “could
 
 *502
 
 follow instructions on the law.” The Supreme Court found that the trial court’s questions were inadequate, and that the refusal to ask the questions requested by defendant violated his Fourteenth Amendment due process rights. The Court noted that while “[t]he adequacy of
 
 voir dire
 
 is not easily the subject of appellate review,” it “ha[d] not hesitated, particularly in capital cases, to find that certain inquiries must be made to effectuate constitutional protections” (504 US at 730).
 

 The Court has also applied heightened reliability to issues arising during the guilt phase. In
 
 Beck v Alabama
 
 (447 US 625), the jury found defendant guilty of intentional killing during a robbery or attempted robbery, and as mandated by the death penalty statute, sentenced him to death. The trial court affirmed the death sentence after holding a hearing in which it considered mitigating and aggravating circumstances. Although there was sufficient evidence to support a jury instruction on felony murder as a lesser included offense, the statute specifically prohibited the judge from charging lesser included offenses. The Court reversed the conviction and the sentence, finding that:
 

 “[t]o insure that the death penalty is indeed imposed on the basis of ‘reason rather than caprice or emotion,’ we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination. The same reasoning must apply to rules that diminish the reliability of the guilt determination. Thus, if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, Alabama is constitutionally prohibited from withdrawing that option from the jury in a capital case” (447 US at 638).
 

 The Court did not decide whether the Due Process Clause required courts to instruct on the lesser included offense in noncapital cases.
 

 The Court has also applied heightened reliability to postsentencing proceedings. In
 
 Ford v Wainwright
 
 (477 US 399 [1986]), the Court found that because the state court hearing was inadequate, defendant was entitled to a new evidentiary hearing in federal court to determine whether he was insane. The Court noted that “[i]n capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability. * * * This especial concern is a natural
 
 *503
 
 consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different”
 
 (id.
 
 at 411 [citations omitted]).
 

 The clear teaching of the Supreme Court’s jurisprudence is that heightened reliability should apply to any issue in the pretrial phase of a capital case which, if resolved against defendant, would enhance the risk of an unwarranted guilty conviction or death sentence. The Supreme Court’s holding in
 
 Estelle v Smith
 
 (451 US 454 [1981]) supports this position. In that case, during the pretrial phase, the court, sua sponte, ordered the state’s attorney to arrange a psychiatric evaluation of defendant to determine his competency to stand trial because it did “not intend to be a participant in a case where the defendant receives the death penalty and his mental competency remains in doubt”
 
 (id.
 
 at 457 n 1). The examination took place without notice to defendant’s counsel. During the sentencing phase, over defendant’s objection, the psychiatrist testified that defendant was an incurable sociopath who would continue to commit crimes if given the opportunity. In finding that defendant’s Fifth Amendment rights were violated because he was not advised of his right to remain silent and that any statement he made could be used against him at a sentencing, the Court noted that “[i]n this case, the ultimate penalty of death was a potential consequence of what respondent told the examining psychiatrist”
 
 (id.
 
 at 462). The Court also found that defendant’s Sixth Amendment right to consult with counsel was violated by the psychiatrist’s examination, which assessed his future dangerousness.
 
 Estelle
 
 is a case in which the Court applied heightened reliability to a determination that occurred at the pretrial stage and which ultimately affected the sentencer’s decision to impose the death penalty
 
 (see also Ake v Oklahoma,
 
 470 US 68 [1985]).
 

 The need for heightened reliability should not be limited to the sentencing phase. The fact that death is different requires that those who face the risk of death generally be provided with greater rights than those who do not. A defendant faces the risk of death at the point the prosecutor serves the notice of intent to seek the death penalty, not just after conviction
 
 (see generally Matter of Hynes v Tomei,
 
 92 NY2d 613,
 
 cert denied
 
 527 US 1015 [1999]). Any error that increases the risk of an unwarranted conviction, which would bring the defendant a step closer to death, must be subject to the heightened reliability standard
 
 (see Beck,
 
 447 US at 637).
 

 Neither
 
 Satterwhite v Texas
 
 (486 US 249 [1988]) nor
 
 Murray v Giarratano
 
 (492 US 1 [1989]) requires a different result.
 
 Sat
 
 
 *504
 

 terwhite
 
 was a straightforward application of
 
 Estelle.
 
 The Court found that the use of the psychiatrist’s testimony at sentencing was a constitutional violation that required reversal of the death sentence. Reversal, however, was not automatic, but was subject to the harmless error standard set forth in
 
 Chapman v California
 
 (386 US 18 [1967]). Heightened reliability and harmless error are not mutually exclusive. Harmless error provides that reversal is not appropriate where the State proves “beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained”
 
 (id.
 
 at 24). The heightened reliability standard seeks to prevent errors from occurring. On direct appeal, heightened reliability calls for heightened review of any error that might have affected the guilt and sentencing verdicts.
 

 Giarratano
 
 involved indigent death row inmates who sought state appointed counsel in their appeal of their state convictions in federal court. The Court declined to provide these capital defendants greater rights than noncapital defendants. The narrow holding of
 
 Giarratano
 
 is that death is not different when it comes to assistance of counsel for inmates seeking relief in federal court of their state convictions and sentences.
 

 The application of the heightened reliability standard to any issue which may affect the death penalty is consistent with the recognition in New York law that unjust convictions may occur
 
 (see
 
 Court of Claims Act § 9). A person who has a “claim for damages against the state for unjust conviction and imprisonment” may bring an action in the Court of Claims (§ 9 [3-a]). The right to monetary compensation, however, can never adequately compensate the person wrongly put to death.
 
 [6]
 

 As a matter of public policy, any doubt as to whether the heightened reliability standard should apply to all phases of a capital case is put to rest by the findings of a Columbia
 
 *505
 
 University School of Law study entitled
 
 A Broken System: Error Rates in Capital Cases,
 
 1973-1995,
 
 [7]
 
 released in June 2000, and begun in 1991, at the urging of the Chair of the United States Senate Committee on the Judiciary. The study, spearheaded by Professor James S. Liebman, found that during the 23-year period, 5,760 defendants were sentenced to death nationally
 
 (id.
 
 at 4). Of those defendants, 4,578 (79%) appealed their death sentences directly to the state’s highest court
 
 (id.).
 
 Some 1,885 (41%) of these defendants had their death sentences reversed
 
 (id. ).
 
 Of nearly all of the remaining defendants, 248 had their death sentences reversed during further postconviction review at the state level
 
 (id.).
 
 Finally, 599 of the remaining defendants had their death sentences reviewed in federal courts, which overturned the death sentences of 237 (40%) defendants because of serious error
 
 (id.).
 
 Overall, only 313 of those sentenced to death were executed
 
 (id.).
 
 In summary,
 
 “[njationally, over the entire 1973-1995 period, the overall error-rate in our capital punishment system was 68%” (id.
 
 at 5). The “overall error-rate” is “the proportion of fully reviewed capital judgments that were
 
 overturned
 
 at one of the three stages due to serious error”
 
 (id.).
 
 “‘Serious error’” is defined broadly to include “error that substantially undermines the reliability of the guilt finding or death sentence imposed at trial”
 
 (id.).
 
 The study identified the most common errors as: “(1) egregiously incompetent defense lawyering (accounting for 37% of the state post-conviction reversals), and (2) prosecutorial suppression of evidence that the defendant is innocent or does not deserve the death penalty (accounting for another 16%-19% when all forms of law enforcement misconduct are considered)”
 
 (id.).
 
 For reversals that occurred at the state postconviction level,
 

 “an astonishing 82% (247 out of 301) of the capital judgments that were reversed were replaced on retrial with a sentence
 
 less
 
 than death, or
 
 no
 
 sentence at all. In the latter regard, 7% (22/301) of the reversals for serious error resulted in a determination on retrial that the defendant was
 
 not guilty
 
 of the capital offense”
 
 [7]
 

 [8]
 

 (id.
 
 [emphasis in original]).
 

 Since the occurrence of serious errors was not limited to the
 
 *506
 
 sentencing stage, neither should the application of the heightened reliability standard be so limited. While a serious error would, in theory, require reversal without the application of heightened reliability, at the trial level, heightened reliability seeks to avoid such errors. And on appeal, heightened reliability seeks to ensure that a court does not overlook a serious error.
 

 While the two other issues addressed below — the failure to permit rebuttal testimony and the failure to exclude a juror for cause — would, standing on their own, require reversal, the case for reversal is made stronger by the application of heightened scrutiny to those rulings.
 

 Rebuttal Testimony
 

 In this case, the jury’s determination that defendant did not suffer from extreme emotional disturbance did not meet the heightened reliability standard primarily because the trial court precluded defendant from offering the expert testimony of Dr. Sanford Drob. At the trial, defendant did not dispute that he killed three victims and attempted to kill a fourth. The jury’s acceptance of the defense of extreme emotional disturbance was his only hope. Defendant was also aware that if found guilty, the same jury would, at the sentencing stage, decide whether he suffered from post-traumatic stress disorder and whether he committed the murders under emotional distress, both of which were mitigators. Thus, his life depended on whether the jury believed that he was suffering from extreme emotional disturbance. Accordingly, during opening arguments, counsel for defendant focused completely on extreme emotional disturbance. Counsel started by saying, “In this opening statement I want to outline for you our defense. Our defense of extreme emotional disturbance and what we expect the evidence to show.”
 

 The court and the prosecution were aware that defendant had retained Drob, a forensic psychologist, and Dr. H. Westley Clark, a psychiatrist. Drob and Clark were both on defendant’s witness list. The defense retained Drob to perform numerous tests on defendant at the urging of Clark who reviewed the results of the tests. Before the trial commenced, defense counsel did not make clear that Drob would be called to testify. In fact, when the prosecutor requested defense counsel to turn over results of the Rorschach test administered by Drob, defense counsel argued that it was unnecessary because counsel was not clear whether Clark had relied on the test, and that “[a]t this point in time we do not anticipate calling
 
 *507
 
 Dr. Dr[o]b in the guilt-innocence phase. At which time we decide otherwise we would of course provide everything that Dr. Dr[o]b has done.” At another point, counsel stated that “[o]ur position, Judge, is that Dr. Dr[o]b would not be testifying at the guilt-innocence phase.” The prosecutor, on the other hand, argued that “Dr. Dr[o]b is on the defendant’s witness list. Dr. Dr[o]b may testify * * * Dr. Martel [1] [the prosecution’s expert witness] in the interest [of] completeness wants to see everything that psychologists and psychiatrists did in relation to this defendant before rendering his opinion.”
 

 Nevertheless, during defense counsel’s direct examination of Clark, the prosecutor objected to the question: “Doctor, I’m going to ask you to comment, if you will, about Doctor Martel [l]’s report and the differences in your mind, if you’d just comment generally.” At an ensuing sidebar, the court and defense counsel engaged in the following dialogue:
 

 “the court: All right, first of all, the Jury has no idea what Doctor Martel[l]’s report is, so what is he going to say?
 

 “[defense]: Well, Judge, I think he’s only going to comment on Doctor Martel [l]’s not finding PTSD [post-traumatic stress disorder]. I can wait.
 

 “the court: I think it’s better to wait because we have not heard from Martel Q].
 

 “[defense]: He’s referred to the report.
 

 “the court: He hasn’t really referred to what his findings were. He just refers to tests that he did. I think it’s sort of anticipating Martel[l]’s testimony before we know what it’s going to be, and I think it would be better to bring him back, I guess.
 

 “[defense]: Sure. I can do that.
 

 “the court: I think that would be better. I think that would be better. This way it’s not only confusing. You’re getting one person interpreting somebody else and then responding to it.
 

 “[defense]: I asked him a question whether to go there or not, but I thought in general, since he’d already talked about the report — but we can save it.
 

 “the court: He didn’t talk about a specific finding. I think we’d better bring him back.”
 

 
 *508
 
 Defense counsel’s direct of Clark ended shortly thereafter, without any further questions about Martell’s report.
 

 Early in his direct, Clark sought to convince the jury of two diagnoses of defendant that served as the groundwork for the rest of his testimony. The first diagnosis was that defendant suffered from mild to moderate brain damage due to his having had spinal meningitis as a child. Clark initially suspected that defendant suffered from mild brain impairment because of the unusual number of accidents he had while working for the Army and for the Department of Correction, and because very often spinal meningitis results in brain damage. To confirm this, Clark asked that defendant be given neuropsychological tests. When asked about the results of these tests, administered by Drob, Clark stated that they confirmed that defendant suffered from mild to moderate brain damage even though his IQ was normal.
 

 Since people with mild brain damage often suffer from psychological problems, Clark also reviewed the tests for evidence of such problems. When asked what these tests showed, Clark discussed the results of the Rorschach test, which established the second diagnosis: that defendant functioned in a rigid manner, and tried to go along with authority; that he had a tendency to deny his surroundings; that he displayed a “style of flight into fantasy”; and that he was pessimistic and showed signs of depression.
 
 [9]
 
 Clark noted that a test administered by Martell, the Million Clinical Multiaxial Inventory-Ill (MCMI-3), supported the finding that defendant functioned in a rigid way. Clark also quoted from a section of Martell’s report which stated that defendant repressed anger.
 

 Clark went on to explain that defendant’s “flight into fantasy” was the product of a “chronic pervasive perceptual problem,” which prevented him from “self-monitor [ing] things except * * * in a very rigid way.” This often results in an inability to deal with problems. The mild brain damage, coupled with the psychological problems, led defendant to rely on drugs to manage his life problems. Defendant’s neurological and psychological problems, Clark testified, affected every aspect of
 
 *509
 
 defendant’s life.
 
 [10]
 
 It affected him in school, in the Army, and more importantly, at the Correction Department. Clark testified that based on his extensive experience with victims of post-traumatic stress disorder, “people who are vulnerable going into high, intense stress [jobs or situations] tend to develop PTSD [post-traumatic stress disorder] at a higher level than people who are not.” Because of his neurological and psychological problems, defendant was vulnerable, and he entered a job that, as Clark explained in detail, is highly stressful.
 

 After setting the groundwork, Clark got to the heart of the testimony: that after talking to defendant, he was satisfied that defendant developed post-traumatic stress disorder after being exposed to numerous stressful experiences, primarily the riot, which constituted the “traumatic” in post-traumatic stress disorder because it produced a sense of fear, horror and helplessness. The second symptom was defendant’s recurrent distressing recollection of the trauma. The third symptom was defendant’s avoidance of feelings associated with the trauma, such as not associating with correction officers, and failing to recollect important aspects of the trauma. The fourth symptom included defendant’s sleep disturbance and difficulty in concentrating.
 

 Clark testified, “Clinically, one [of] the things that the testing did not adequately address, but in clinical he shows post-traumatic stress disorder, which is a[n] important concomitant to all of this.” While the tests themselves did not show that defendant was suffering from post-traumatic stress disorder, the diagnosis that defendant had neurological and psychological problems was essential to the diagnosis that defendant developed post-traumatic stress disorder as a result of having a highly stressful job. With respect to Clark’s referring to Mar-tell’s tests, three references, two of which were general, supported the specific diagnosis Clark was discussing, and were not prompted by a direct question about the tests.
 

 Despite defense counsel’s initial ambivalence about whether to call Drob or not, during a scheduling break in the prosecution’s cross-examination of Clark, defense counsel reminded the court of Drob, and that the day before he had received “the raw data from Doctor Martel[1].” Defense counsel then explained how he expected to proceed:
 

 “[defense] : That [the prosecution’s direct of Mar-
 
 *510
 
 tell] finishes up, I would need overnight for Drob. However, if we determine that Clark does not need to remain to surrebut Martel[1] and Drob does, if it’s Drob, then we can proceed tomorrow. If it’s Clark, then we can proceed Friday, but either way, we both anticipate that there’s no problem finishing Friday.
 

 “ [prosecution] : Right.
 

 “the court: Assume nobody has to be to the dentist, the doctor, the foot doctor, the eye doctor.
 

 “[defense]: I think that we’ll be able to make a call at the end of Martel [l]’s direct. We’ll be able to confer with Doctor Clark. I mean, obviously, if I don’t have to surrebut, I don’t want to.”
 

 After Clark was cross-examined, and another witness for defendant testified, Martell took the stand. Martell testified that he had observed Clark’s testimony, something which the prosecutor noted is out of the ordinary. The reason he did it, Martell testified, was so that he could understand what Clark has “told you and all facts that he was relying on so I can take all of that into consideration in providing you with my opinions.” Immediately thereafter, Martell mentioned that Drob was in the court observing him. The prosecutor then asked, “Clark has moved on to other tasks, is that right, as far as you know?” Martell said that he did not know, and then he said that he did not see Clark in the court.
 

 Martell testified that he examined defendant for two days. The two days were spent “talking and taking tests.” Martell administered either 25 or 26 tests, some of which were different from the ones Drob had administered. Martell juxtaposed the results of his tests with the results of Drob’s tests on a chart. Of course, Clark had already testified and defense counsel could not have argued that Martell should not discuss Drob’s tests. For the first half of his testimony, Martell discussed the specific tests he administered and how they compared with Drob’s results. Afterwards, the prosecutor asked the following question:
 

 “Q So overall the conclusion of your testing did you observe any serious problems, neuropsychologically, for the defendant?
 

 “A No.”
 

 
 *511
 
 During the second half of his testimony, Martell refuted Clark’s conclusions, such as that meningitis is associated with brain damage or that defendant suffered from post-traumatic stress disorder. Afterwards, the prosecutor asked the following question:
 

 “Q Is there anything in his neuropsychological behavior to suggest that he was upset or emotionally out of control at the time he did these murders?
 

 “A There’s nothing.”
 

 After Martell’s cross-examination, defense counsel sought to have Drob, rather than Clark, testify. The prosecution, however, objected, arguing that Drob could have testified on direct, that Clark referred to Drob’s material in his testimony, that the defense had an opportunity to criticize Martell during cross-examination, and that the decision not to call Drob on direct was strategic. The court, after listening to Drob’s proffer, agreed.
 

 The trial court should have allowed Drob to testify. Given the court’s ruling on Clark’s direct, that Drob could have testified during defendant’s case-in-chief is immaterial. In fact, it appears that until Clark’s direct, the defense did not expect to call Drob. The defense expected to rely on Clark to criticize Martell’s report. However, when on direct examination defense counsel asked Clark a question addressing the findings in Mar-tell’s report, the court told defense counsel not to pursue that line of questioning until after Martell testified. The court’s message was clear: once Martell testified, Clark could testify again and defense counsel could then ask him about Martell’s report. Thereafter, defense counsel, apparently seeking to keep her options open, informed the court and the prosecutor that she would either call Drob or Clark, not necessarily the latter, as was the court’s understanding. The court tacitly agreed, and the prosecutor said “Might.” The court and the prosecution were therefore well aware of the defense’s intention to call Drob after Martell testified. The need to call Drob to rebut Martell would not have arisen had the court permitted the defense witness, Clark, to answer questions about Martell’s findings. It is therefore disingenuous for the prosecution to argue that the decision not to call Drob on direct was strategic.
 

 It is also disingenuous for the prosecution to argue that Clark referred to the report in his direct. In trying to persuade the court to allow the question about the report, defense counsel also stated that Clark had already referred to it. The court,
 
 *512
 
 however, stated that while Clark had referred to the tests administered by Martell, he had not referred to the findings of those tests. In any event, Clark was asked only once to comment on the report, and prior to that, he referred to Martell’s tests twice in a general sense, and once specifically, only to the extent that they supported the specific diagnosis he was discussing.
 

 The failure to allow Drob to testify was not cured by the fact that Martell was cross-examined by the defense. The criticism by an expert is not the same as criticism by a lawyer. If that were the case, there would have been no need for the prosecution to present Martell, given that cross-examination of Clark would have been sufficient.
 

 Separately, Drob’s testimony would have been proper under CPL 260.30, which provides in part that:
 

 “6. The defendant may offer evidence in his defense.
 

 “7. The people may offer evidence in rebuttal of the defense evidence, and the defendant may then offer evidence in rebuttal of the people’s rebuttal evidence. The court may in its discretion permit the parties to offer further rebuttal or surrebuttal evidence in this pattern. In the interest of justice, the court may permit either party to offer evidence . upon rebuttal which is not technically of a rebuttal nature but more properly a part of the offering party’s original case.”
 

 Clark’s testimony was thus evidence in his defense, and accordingly, Martell’s testimony was rebuttal of Clark’s. Under subdivision (7), the defense had the discretion to “offer evidence in rebuttal of the people’s rebuttal evidence.” Following defendant’s rebuttal, any further rebuttal was subject to the court’s discretion. But the decision to offer rebuttal was defendant’s right. The statute clearly gives the party that goes first the last word.
 
 [11]
 
 The court thus erred in refusing to allow Drob’s testimony, which, as shown below, would have been proper rebuttal.
 

 
 *513
 
 This Court has defined rebuttal evidence as either “ ‘evidence in denial of some affirmative fact which the answering party has endeavored to prove’ ”
 
 (People v Harris,
 
 57 NY2d 335, 345 [1982] [quoting
 
 Marshall v Davies,
 
 78 NY 414, 420 (1879)]) or evidence which “ ‘contradict[s] the testimony of a witness as to any matters upon which he has been called to give evidence in chief, provided it is not collateral to the issue’ ”
 
 (People v Harris,
 
 57 NY2d at 345 [quoting
 
 Ankersmit v Tuch,
 
 114 NY 51, 55 (1889)]). The first definition recognizes that the party with the burden should present all of the relevant evidence during its case-in-chief. The second definition, however, recognizes that the party with the burden should not be expected to impeach or contradict the testimony of a witness of the answering party before that witness has testified. Thus, evidence offered for the purpose of supplementing the offering party’s burden is not proper rebuttal evidence. But if that evidence contradicts a statement of the other party’s witness, it is proper rebuttal evidence so long as it is not collateral.
 

 In
 
 Harris,
 
 the People had the burden of establishing that the defendant intended to kill the victim, her longtime lover and companion. During their case-in-chief, the People introduced evidence dealing with the enmity between defendant and the victim, the source of which was the victim’s relationship with another woman. The People did not, however, introduce evidence that on the day of the murder, defendant and the victim had an argument over the phone in which the victim told defendant to stop bothering him, that she had cheated, and that she was going to inherit $240,000. During cross-examination, defendant denied that the conversation had taken place. The People could have introduced the evidence of the conversation during direct or during cross-examination since it refuted defendant’s position that she had gone to the victim’s house only to kill herself, and that there was no enmity between the two. Nevertheless, this Court found that it was properly admitted in rebuttal because the prosecution offered the evidence “not to establish an element of its case-in-chief (i.e., intent to kill), but merely to contradict [defendant’s] testimony and to disprove the alternate state of mind [she] offered to explain her actions”
 
 (id.
 
 at 345).
 

 Thus, under
 
 Harris,
 
 defendant had the right to offer Drob’s testimony to the extent it contradicted Martell’s testimony, even if it could have been offered on direct. While some of what Drob sought to offer would have been collateral, some of this testimony would have contradicted Martell. The defense at
 
 *514
 
 torney stated, “Dr. Drob would be testifying to refute the findings that Dr. Martell has made insofar as his psychological tests.” For example, Drob would have contradicted Martell’s equating of the Rey Complex Figure with the Benton test. According to Drob, the two tests were not comparable. Drob also would have contradicted Martell’s assertion that poor performance in drawing tests showed only lack of artistic ability or draftsmanship. Drob would have testified that such tests “are the most profound and most useful neuropsychological tests that we have as psychologists.” In addition, Drob would have contradicted Martell’s assertion that in the tactile performance test, it is normal for the dominant hand to do better than the nondominant hand. Drob’s position was that in this test, the nondominant hand normally performs better than the dominant hand, and the fact that defendant’s dominant hand did better, was a clear indication of brain dysfunction.
 

 Also under
 
 Harris,
 
 defendant had the right to offer evidence in support of his case-in-chief which denied new evidence offered by the People. Martell testified to tests he administered, and any testimony by Drob concerning those tests would have been new. Clark had not discussed most of Martell’s tests on direct. Defendant also had the right to challenge Martell’s testimony concerning tests administered by Drob. Testimony by Drob, if permitted, would have enabled the defendant to challenge Martell’s interpretation of the results of Drob’s tests. For example, Drob argued that in the report, Martell noted that the Trail Making test had an irregularity, meaning an error in administering it, which according to Drob means that the test is flawed; yet Martell relied on the results of the test and glossed over the irregularity. A narrow view of rebuttal evidence is not appropriate in cases such as this one in which the evidence consists of the testimony of an expert refuting the testimony of the other side’s expert. This battle of the experts increases the reliability of the jury’s determination.
 

 Contrary to the view of the majority, admission of the rebuttal by Drob was not subject to the court’s discretion. Section 260.30 (7) permits the People to offer rebuttal to defendant’s evidence and then permits defendant to offer rebuttal to the People’s rebuttal. Only after the People’s rebuttal and the defendant’s rebuttal does CPL 260.30 (7) give the court discretion to permit further rebuttal or surrebuttal. That same section also permits the court to allow evidence “not technically of a rebuttal nature” but which may be allowed “[i]n the interest of justice”
 
 (see
 
 CPL 260.30 [7]). Here, the court erred because it
 
 *515
 
 concluded that Drob’s testimony would be surrebutal evidence which it had the discretion to disallow.
 

 Ultimately, what is significant is that Martell’s testimony went unchallenged by an expert. Martell, however, was able to refute the findings of Clark and Drob.
 

 It cannot be denied that the reason Drob did not testify was the court’s about-face. The court’s conduct would be troubling in any type of case. But it is particularly troubling considering that this is a capital case in which defendant’s life depended on whether or not the jury rejected or accepted his extreme emotional disturbance defense. The fact that Drob testified at the sentencing phase of the case was no substitute for testimony that was related to the guilt phase of the trial. At the sentencing phase, the jury did not have the option to decide whether defendant committed the murders while under extreme emotional disturbance. The sentencing sheet did ask the jury whether defendant committed the murders while he was mentally or emotionally disturbed, but not whether he was under “extreme” emotional disturbance.
 

 The verdict sheet also asked whether defendant suffered from post-traumatic stress disorder. Two jurors found that defendant was mentally or emotionally disturbed, and none found that he was suffering from post-traumatic stress disorder. It is impossible to know whether the two jurors who found that defendant was emotionally disturbed would have found that he was under extreme emotional disturbance had they listened to Drob’s testimony during the guilt phase. Had one juror accepted the defense, the jury would have been deadlocked. In any event, the reliability of the jury’s determination with respect to defendant’s mitigation factors is called into doubt by the court’s instruction that the jury could reject a mitigating factor even if it was established. Thus, not one of the jurors found that defendant served New York City as a correction officer for almost eight years even though that mitigator was undisputed.
 

 In light of the other errors related to the extreme emotional disturbance defense, it cannot be said that, beyond a reasonable doubt, the failure to allow Drob to testify did not affect the jury’s guilt verdict. Whatever the views of the majority and the dissent concerning the testimony of Drob, defendant had a right to have a jury determine the significance of that testimony. Defendant was thus prevented from adequately asserting his constitutional right to a defense
 
 (People v Hudy,
 
 73
 
 *516
 
 NY2d 40 [1988],
 
 abrogated on other grounds Carmell v Texas,
 
 529 US 513 [2000];
 
 see also Chambers v Mississippi,
 
 410 US 284, 294 [1973] [“The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State’s accusations. The rights to confront and cross-examine witnesses and to call witnesses in one’s own behalf have long been recognized as essential to due process”]).
 

 One of the other errors, as the majority agrees, was the prosecution’s arguing in summation that defendant smiled at Angela Brown, and that he smirked at Detective Whiteside, during their respective direct examinations. The People sought to convince the jury, and this Court on appeal, that the alleged smiling refuted defendant’s extreme emotional disturbance defense. We reject that argument, affirming the view articulated in
 
 People v Basora
 
 (75 NY2d 992, 994 [1990]), that a smile is ambiguous and of minimal probative value. It is doubtful, however, that the jury arrived at the same conclusion. When the prosecutor first referred to the alleged smile at Angela Brown, defense counsel objected, but was overruled by the court. It is likely then that members of the jury considered this prosecution argument in deciding that defendant did not suffer from extreme emotional disturbance. Were this a non-capital case, we might have decided, as we did in
 
 Basora,
 
 that the error did not present a preserved question of law because counsel only made a general objection and failed to ask for a curative instruction
 
 (id.).
 
 But because this is a capital case, on appeal directly from Supreme Court, not the Appellate Division, pursuant to CPL 450.70 (1) and article VI, § 3 (b) of the New York Constitution, the error is reviewable.
 

 Another error, as the majority also agrees, is the testimony of the family members of the victims. Prior to trial, defense counsel moved to preclude the testimony of the family members on the basis that it would be inflammatory and prejudicial. The court rejected defense counsel’s argument, finding that the family members would testify to the effect that “I saw the body, and this was who it was.” In response, the prosecutor confirmed that the family members would “come in and say: This was so and so, my relation, and I went and viewed their body.” During the trial, however, the People, and to a certain extent the court, did an about-face. All of the family members called by the People testified about the lives of the victims, in a few instances, in response to the prosecutor’s leading questions. After the family members testified, defendant moved to strike their testimony to the extent it went beyond the approved
 
 *517
 
 boundary. The court denied the motion. The People do not dispute that this issue was properly preserved. As the majority recognizes, the testimony of the family members in this case is indistinguishable from the testimony in
 
 People v Miller
 
 (6 NY2d 152 [1959]) and
 
 People v Caruso
 
 (246 NY 437 [1927]).
 

 In
 
 Caruso,
 
 it was undisputed that the defendant killed a doctor because he believed that the doctor killed his child. “The real issue” was whether defendant “formed the intent to kill [the doctor], and if so whether the killing was the result of premeditation and deliberation”
 
 (id.
 
 at 443). Although “horrified at the conceded brutality of [defendant’s] acts,” the jury was bound to “decide this issue in a judicial temper. Appeals to sympathy or prejudice can * * * be harmful”
 
 (id.).
 
 This Court found that the testimony of the doctor’s wife “had no materiality upon the issues before the jury. The object of the State is clear. Although, doubtless, the result of ‘well intentioned though misguided zeal,’ it was an ‘unseemly and unsafe’ appeal to prejudice”
 
 (id.
 
 at 444).
 

 In this case, the testimony of the family members was no less an appeal to prejudice. The testimony distracted the jury from the real issue in this case — whether defendant committed the murders under extreme emotional disturbance. In fact, unlike
 
 Caruso
 
 or
 
 Miller,
 
 the People in this case relied on some of the improper testimony of the family members during summation. Nothing said or elicited by defense counsel justified the People’s use of the improper testimony. Rather, the prosecution was determined to make the victims and those they left behind the issue in this case. Thus, even the statement of Evelyn Davis that she had five babies, which was arguably properly admitted to show defendant’s state of mind, was used by the prosecution in an improper manner. At one point, after stating that Evelyn Davis was the mother of five, the prosecutor invoked the victims as a group, and appealed to the jury, arguing, “They can’t ask you for justice. I can.” The prosecutor, thus, went beyond the well-defined limits of summation
 
 (see People v Ashwal,
 
 39 NY2d 105 [1976]), by referring to matters not in evidence (the alleged smile), and by focusing on improper evidence (the family testimony), which led the jury away from the real issue in this case.
 

 There is no doubt that defendant committed three homicides and attempted to commit a fourth. But this does not mean that defendant did not deserve a fair trial on the issue of whether he was suffering from extreme emotional disturbance. The Legislature has declared that a defendant who establishes the
 
 *518
 
 defense of extreme emotional disturbance may not be found guilty of murder (or attempted murder), but only of first degree (or attempted first degree) manslaughter, which is not a death eligible crime
 
 (see
 
 Penal Law § 125.20 [2]; § 125.27 [2] [a]). Because the errors affected defendant’s ability to effectively present his extreme emotional disturbance defense, the jury’s rejection of the defense did not meet the heightened standard of reliability.
 

 Juror No. 233
 

 Section 270.20 (2) of the Criminal Procedure Law states that if a court makes an erroneous ruling with respect to a challenge for cause, a reversal is required if the defendant exhausts his or her peremptory challenges prior to the end of jury selection.
 
 [12]
 

 A decision on whether or not Juror No. 233 should have been excluded for cause must take into consideration the instructions given by the court to the prospective jurors before they
 
 *519
 
 were questioned. The Judge gave the following instructions to the prospective jurors:
 

 “If we have a penalty phase, the same jury will determine the sentence and the jury will be given two choices.
 

 “One will be life without the possibility of parole and the other will be death.
 

 “In reaching this sentence, the jury will be asked to consider and weigh what we calling [sic] aggravating factors and mitigating factors, which are big words for saying aggravating factors are the crime of which he has just been convicted: you will have convicted of him [sic], and the prosecution will ask you to impose the death penalty based on the nature of this crime and what you heard about it.
 

 “The defendant will be presenting mitigating evidence, which is any fact or circumstance relating to the crime, or to the defendant’s state of mind or to the defendant’s condition at the time of the crime or any testimony or information as to his character, background or record.
 

 “And the defendant will ask you to consider those factors and to decide to give him life without possibility of parole.
 

 “After you heard all of that, you will be sent into the jury room, and I will give you the law on how you consider these things, and then you will go into the jury room and try to reach a unanimous verdict as to these two possible verdicts:
 

 “Life without the possibility of parole and death” (emphasis supplied).
 

 Juror No. 233 was asked several times if she would consider child abuse as a mitigating factor and her answer was no. The answers of Juror No. 233 on child abuse, in turn, were tied to her view of whether or not she would consider mitigating factors in determining whether life or death should be the sentence. The defense was not required to go beyond the questions asked in order to establish that Juror No. 233 should have been excused for cause.
 

 Specifically, the questioning of Juror No. 233 included the following question and answer from the prosecution:
 

 
 *520
 
 “Q Okay. And you put down any previous life experiences. So I take that to mean that includes all you’re shaking your head no?
 

 “A Child abuse, I’m not for that because I don’t believe that because everybody is using that now. This is the way I feel. Everybody is using it to get over with something they do. They was abused when they was a child.”
 

 The defense asked Juror No. 233 the following questions:
 

 “Q Now, you were also asked about would you be able to consider things that we might tell you as a reason — let’s assume now that you’re on the jury and you’ve convicted Mr. Harris, okay?
 

 “We’ll just pretend that that’s true, all right? And you’ve convicted him of killing three people and attempting to kill a fourth person and what would meet your criteria for cold blood.
 

 “And we would have an opportunity to try to tell you stuff to convince you not to sentence him to death, and you said that if we were to give you information that he suffered child abuse when he was a child and that that might have affected his behavior later on, that that would be something that you wouldn’t think would matter very much?
 

 “A Nope.
 

 “Q Can you explain why that is?
 

 “A Well, right now I feel like everyone is using that and anyone, okay, anything they do. Their father might have hit them when they was younger, so now they’re going to grow up and hate all — uh-uh, it just doesn’t work with me. The child abuse, m’m m’m. * * *
 

 “Q Now, we talked about child abuse already. Sometimes when people are older. They suffer traumatic experiences also. Do you think traumatic experiences that somebody went through when they were an adult could affect their behavior later on?
 

 “A I believe so, yes. I think so.
 

 “Q Would you feel differently about those kinds of
 
 *521
 
 traumas that people went through when they were adults than child abuse?
 

 “A
 
 What kind of traumas? You mean someone suffered child abuse, as an adult just being abused?
 

 “the court: Give her some examples.
 

 “Q In this case you might hear evidence that Mr. Harris was a corrections officer, that he was involved in protecting another officer’s life during an inmate riot and that he suffered significant traumatic damage at that time, psychiatric damage as well as physical — you know, pummeling.
 

 “Is that something that you could take into account as something that could affect some of his behavior later on?
 

 “A Yes.
 

 “Q And why do you feel differently about that than you do about child abuse?
 

 “A Because child abuse to me really — I mean in some ways, depending on — I don’t think a lot — I don’t really believe that everyone is being abused lately.
 

 “Now we’re hearing about — what I hear, everyone is saying they was abused for everything they’ve done: It’s because when I was two, my father hit me or when I was three, my mother touched me. I don’t believe it. I don’t believe it at all.”
 

 The defense attorney challenged Juror No. 233 for cause, stating that “her inability to consider and give any weight to one of what will be one of the relevant mitigators is the basis to disqualify her from [sic] cause from serving on the jury.” The prosecutor stated that he would “rely on the record.”
 

 The trial court denied the challenge. In addition to stating that it felt the juror would be open to a persuasive argument, the court stated, “So leaving aside the question of whether every mitigator must be accepted by the juror, I have yet to decide, I don’t think this is an enumerated mitigator. It is not like intoxication.”
 

 Juror No. 233 stated that she would not consider child abuse in determining whether to impose a sentence of life imprisonment without parole. Thus, the challenge for cause should have
 
 *522
 
 been granted. A juror who cannot consider a mitigating factor is incapable of rendering an impartial verdict
 
 (see generally supra
 
 at 501 n 4). In addition, nothing in CPL 270.20 (1) (f) authorizes the court to consider separately a juror’s views on the guilt and sentence phases of the trial.
 

 In
 
 People v Arnold
 
 (96 NY2d 358, 368 [2001]), this Court upheld the reversal of a conviction where a juror “volunteered that she had a predisposition that might prevent her from being impartial in a domestic violence case.” This Court’s analysis in
 
 Arnold
 
 is particularly relevant in the present death case:
 

 “Prospective jurors who make statements that cast serious doubt on their ability to render an impartial verdict, and who have given less-than-unequivocal assurances of impartiality, must be excused
 
 (see, People v Blyden,
 
 55 NY2d 73, 78;
 
 see also, People v Torpey,
 
 63 NY2d 361, 367-369). By contrast, where prospective jurors unambiguously state that, despite preexisting opinions that might indicate bias, they will decide the case impartially and based on the evidence, the trial court has discretion to deny the challenge for cause if it determines that the juror’s promise to be impartial is credible
 
 (see, People v Williams,
 
 63 NY2d 882, 884-885)” (96 NY2d at 363).
 

 The duty of the defense attorney was complete when he established that the juror might not be impartial on a mitigating issue that could be determinative of life or death. It was then up to the prosecution and the court to establish that notwithstanding these views, the juror could be fair.
 

 Matter of Hynes v Tomei
 

 In
 
 United States v Jackson
 
 (390 US 570 [1968]), the Supreme Court struck the death penalty provision of the Federal Kidnaping Act (18 USC § 1201 [a])
 
 [13]
 
 because it “authorized the death penalty only on the recommendation of a jury, while a
 
 *523
 
 defendant convicted of the same offense on a guilty plea or by a Judge escaped the threat of capital punishment”
 
 (Hynes,
 
 92 NY2d at 621). In a series of 1971 cases in which death sentences were imposed after trial under a constitutionally defective North Carolina statute, the Supreme Court summarily reversed the death sentences, relying on
 
 Jackson.
 
 In those cases
 
 (see Atkinson v North Carolina,
 
 403 US 948;
 
 Childs v North Carolina,
 
 403 US 948;
 
 Hill v North Carolina,
 
 403 US 948;
 
 Roseboro v North Carolina,
 
 403 US 948;
 
 Sanders v North Carolina,
 
 403 US 948;
 
 Williams v North Carolina,
 
 403 US 948), the Supreme Court succinctly stated: “Judgment, insofar as it imposes the death sentence, reversed,
 
 United States v. Jackson,
 
 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968)”
 
 (see also Funicello v New Jersey,
 
 403 US 948 [1971] [construing a New Jersey statute];
 
 Thomas v Leeke,
 
 403 US 948 [1971] [construing a South Carolina statute]).
 

 In
 
 Matter of Hynes v Tomei
 
 (92 NY2d 613), this Court held that it was unconstitutional for a defendant charged with first degree murder to plead guilty to capital murder under a statute that permitted a death sentence after a jury trial but did not permit a death sentence on a plea of guilty
 
 (id.
 
 at 629 n 7). The Court found that the statute “explicitly provides two levels of penalty for the same offense, imposing death only on those who assert innocence and proceed to trial”
 
 (id.
 
 at 620). The Court struck the plea provisions
 
 [14]
 
 so that “a defendant [could] not plead guilty to first degree murder while a notice of intent to seek the death penalty is pending”
 
 (id.
 
 at 629).
 

 The same issue operates in the present case as defendant was made to choose between entering a plea or going to trial, a scheme that was declared violative of
 
 Jackson
 
 in
 
 Hynes.
 

 Assuming a new trial occurred, a relevant question would be whether the defendant could again face the death penalty.
 
 *524
 
 While a retrial leading to death would raise constitutional questions, the focus of the arguments before the Court was not on retrial. Several options are available. First, prior to a retrial, this Court could direct further argument limited to that issue. Second, this Court could hold this appeal in abeyance and remand the case for argument on this issue, with any decision of the trial court being immediately appealed to this Court. Third, we could vacate the judgment and direct the District Attorney to state whether, on retrial, he would seek the death penalty. If he does, defendant could bring a CPLR article 78 proceeding. In that way, the parties would know whether the death penalty could be imposed and the retrial conducted under the heightened scrutiny applicable to death cases.
 

 Accordingly, I would reverse both the conviction and the sentence.
 

 Chief Judge Kaye and Judges Levine, Ciparick, Rosenblatt and Graffeo concur with Judge Wesley; Judge Smith dissents in part and votes to reverse and order a new trial in a separate opinion.
 

 Judgment modified by vacating defendant’s sentence and remitting to Supreme Court, Kings County, for resentencing in accordance with the opinion herein and, as so modified, affirmed. Appeal from Supreme Court order dated June 10, 1999, dismissed as academic.
 

 [1]
 

 . Jury selection began on March 10, 1998 arid ended on April 28, 1998.
 

 [2]
 

 . Only 12 counts were submitted to the jury for consideration: six counts of murder in the first degree (Penal Law § 125.27 [1] [a] [vii], [viii]), one count of attempted murder in the first degree (Penal Law §§• 110.00, 125.27 [1] [a] [vii]), one count of attempted murder in the second degree (Penal Law §§ 110.00, 125.25 [1]), three counts of murder in the second degree (Penal Law § 125.25 [1]) and one count of criminal possession of a weapon in the second degree (Penal Law § 265.03 [2]).
 

 [3]
 

 . We reject as without merit defendant’s contention that the assignment of Justice Feldman constituted improper “judge shopping” by the prosecution.
 

 [4]
 

 . Intoxication is not a defense to a criminal charge but may be offered by a defendant whenever it is relevant to negate an element of the crime charged (Penal Law § 15.25).
 

 [5]
 

 . [1] The suggestion that a departure from
 
 Valles
 
 might be necessary in capital cases
 
 (see People v Prater,
 
 170 Misc 2d 327, 332) should not be followed.
 

 [6]
 

 . [2] We reject defendant’s further argument that the integrity of the grand jury proceeding was impaired by the prosecutor’s refusal to instruct the grand jury on its mercy-dispensing power pursuant to CPL 190.65
 
 (see People v Sullivan,
 
 68 NY2d 495, 501), on the consideration of mitigating evidence relating
 
 to
 
 punishment, and on the prohibition against consideration of race in its deliberations
 
 (cf. People v Bastien,
 
 170 Misc 2d 103, 106).
 

 There is no authority mandating that the prosecutor charge the grand jury on mercy, even in a potential capital case
 
 (People v Muhammed,
 
 183 Misc 2d 591, 598). It is presumed that the grand jury will exercise mercy on its own accord
 
 (see Sullivan,
 
 68 NY2d at 501). The decision to seek the death penalty is within the discretion of the prosecutor
 
 (see Matter of Francois v Dolan,
 
 95 NY2d 33, 38; CPL 250.40). The determination to impose the death penalty falls to the petit jury
 
 (see
 
 CPL 400.27), not the grand jury. Thus, the prosecutor is not required to advise the grand jury that it has the power to seek out and consider evidence that mitigates punishment, or inform the grand jury that defendant requested presentation of such evidence. Finally, defendant has not shown racial prejudice with respect to the grand jury.
 

 [7]
 

 . CPL 270.20 (1) (f) provides:
 

 “A challenge for cause is an objection to a prospective juror and may be made only on the ground that: * * *
 

 “The crime charged may be punishable by death and the prospective juror entertains such conscientious opinions either against or in favor of such punishment as to preclude such juror from rendering an impartial verdict or from properly exercising the discretion conferred upon such juror by law in the determination of a sentence pursuant to section 400.27.”
 

 [8]
 

 . Of six social science studies introduced by the respondent in
 
 Lockhart,
 
 three had been rejected by the Court years before when it decided
 
 Wither-spoon v Illinois
 
 (391 US 510). The Court was unconvinced that those studies, which remained unchanged, overcame their “tentative and fragmentary” nature and made out a claim of constitutional error 18 years later
 
 (Lockhart,
 
 476 US 162, 171 [internal quotation marks omitted]). The Court further doubted the value of the three additional
 
 post-Witherspoon
 
 studies offered by the respondent. All three studies were based on responses from individuals randomly selected from a segment of the population but who had not served as jurors on a capital case. Two of the three studies failed to simulate the process of jury deliberation. Finally, only one of the six studies even attempted to identify the presence of “nullifiers” or “individuals who, because of their deep-seated opposition to the death penalty, would be unable to decide a capital defendant’s guilt or innocence fairly and impartially”
 
 (id.
 
 at
 
 *479
 
 172). The Court noted that even the respondent conceded that the failure to take into account the presence of “nullifiers” rendered the studies “fatally flawed”
 
 (id.).
 

 [9]
 

 . Contrary to defendant’s additional contention that he was denied adequate opportunity to inquire as to prospective jurors’ racial biases, the trial court here did not abuse its discretion in restricting the scope of voir dire limiting repetitive or irrelevant questioning
 
 (see People v Pepper,
 
 59 NY2d 353, 358; CPL 270.16 [1]).
 

 [10]
 

 . There is apparently some confusion among the lower courts as to whether the statute envisions a standard different from
 
 Wainwright (compare People v Hale,
 
 173 Misc 2d 140, 193,
 
 with People v McIntosh,
 
 173 Misc 2d 724, 725).
 

 [11]
 

 . [9] Defendant questions the prosecution’s tactic of focusing on the aggravating facts of this particular case and the trial court’s granting of the People’s for-cause challenges against jurors who had expressed that, while they could conceive of a case warranting the imposition of the death penalty, they would be unable to impose the death penalty under the circumstances of this particular case. Because the entire statutory and constitutional
 
 line of
 
 inquiry is directed toward determining whether a juror’s attitude for or against the death penalty would affect that person’s capability to sit fairly in the case at hand, it necessarily follows that the inquiry properly focused on the jurors’ views as they related to the case at hand, not merely in the abstract. Thus, the trial court properly required the jurors to be able to impartially consider the penalty “in this case.”
 

 [12]
 

 . Defendant clearly couched his objection to No. 233’s jury service in the context of her views on child abuse as a capital mitigating circumstance. Defendant did not contend that the alleged abuse of defendant as a child may have also been relevant during the guilt phase with respect to defendant’s extreme emotional disturbance defense. Had counsel raised the question of its relevancy to the guilt phase, the trial court’s analysis could have focused on CPL 270.20 (1) (b). Indeed, after death qualification and during group voir dire, defendant did not pose any additional questions concerning child abuse as it related to the defense of extreme emotional disturbance. Because Juror No. 233 did not serve and defendant does not contend that the jury as constituted contained a biased juror, we choose not to reach his unpreserved claim now being raised on appeal that No. 233’s views disqualified her from jury service under CPL 270.20 (1) (b).
 

 [13]
 

 . Defendant’s remaining jury selection arguments concern (1) two other jurors whom defendant alleges should have been excluded for cause, (2) the exclusion of 11 prospective jurors challenged by the People for cause, (3) the wrongful exclusion for cause of five jurors who indicated an unwillingness to convict on eyewitness testimony alone, (4) the removal of sworn Juror No. 7, and (5) the trial court’s reordering of the venire after life/death qualification.
 

 The trial court did not err in its determinations with respect to the two jurors whom defendant alleges should have been excluded for cause, and the removal of Juror No. 7. As for defendant’s arguments concerning the People’s for cause challenges, including the exclusion of purportedly qualified jurors who would not consider eyewitness testimony, there is both a constitutional and statutory aspect to these claims. Any meritorious challenge on constitutional grounds in this regard would only result in vacatur of the death sentence
 
 (see Gray v Mississippi,
 
 481 US 648, 659). There is none here. As for defendant’s statutory claims against the People’s for-cause challenges under CPL 270.20 (1) (b) and (f), defendant concedes that the prosecution had two unexercised peremptories (appellant’s brief at 196) and thus defendant is not entitled to assert CPL 270.20 (2) as a basis for reversing his conviction.
 

 Finally, defendant’s contention that the court erred by reordering the venire after life/death qualification of the jurors is without merit.
 

 [14]
 

 . None of us see a need to discuss the court’s
 
 Rosario
 
 ruling. Defendant abandoned his request for a sanction and failed to establish that the material was prejudicial.
 

 We also reject defendant’s contention that the trial court exceeded its authority under CPL 240.30 by ordering the disclosure of notes used by defendant’s nontestifying expert, Dr. Jeffrey Gardere, as part of his examination. Defendant’s testifying expert, Dr. Clark, relied upon Gardere’s report in evaluating defendant. Thus, the notes were disclosable as documents relating to defendant’s extreme emotional disturbance defense (CPL 240.30 [1] [a]).
 

 Lastly, we conclude that defendant voluntarily waived his
 
 Miranda
 
 rights
 
 (see People v Williams,
 
 62 NY2d 285;
 
 People v Anderson,
 
 42 NY2d 35, 38). The evidence fails to show that defendant’s will had been “overborne” or his “capacity for self-determination critically impaired”
 
 (Colorado v Spring,
 
 479 US 564, 574). Moreover, defendant’s statements made prior to being advised
 
 *488
 
 of his
 
 Miranda
 
 rights were spontaneous and were not part of any subtle encouragement or provocation by the police
 
 (People v Rivers,
 
 56 NY2d 476, 479).
 

 [15]
 

 . Both parties continually refer to Drob as a surrebuttal witness. Since defendant had the burden of proof on the affirmative defense, Drob is better viewed as a rebuttal witness under the statute (see CPL 260.30 [7]).
 

 [16]
 

 . The trial court ruled that Detria Davis, Evelyn Davis’ mother, would be permitted to testify that Evelyn had five children. Defendant claims constitutional and evidentiary error in that regard. The constitutional claim is unpreserved but even under the higher standard, the error was harmless
 
 (see People v Crimmins,
 
 36 NY2d 230, 237).
 

 [17]
 

 . We see no error with respect to the remaining evidentiary rulings raised by defendant.
 

 [18]
 

 . Defendant argues that the prosecutor invited the jury to punish defendant for exercising his rights to a trial and not to testify, that the prosecutor misstated the record, referred to facts not in evidence, and misused evidence, and that the prosecutor denigrated defendant’s defense and inflamed the jury. Defendant did not object to many of the specific comments during the summation and the few objections defendant did raise were all of a general nature; his complaints are thus unpreserved
 
 (see People v Dien,
 
 77 NY2d 885, 886;
 
 People v Rivera,
 
 73 NY2d 941, 942). If we were to review them we would conclude that those statements do not “exceed the broad bounds of rhetorical comment permissible in closing argument”
 
 (People v Galloway,
 
 54 NY2d 396, 399).
 

 Defendant also contends that the prosecution’s use of the testimony of the victims’ family members on summation
 
 (see
 
 discussion IV, part B,
 
 supra
 
 at 490-491) and its plea that while the victims “can’t ask you for justice. I can” were improper. We reiterate our concern about the propriety of admitting testimony from family members of the victims on matters collateral to the is
 
 *492
 
 sues raised at trial. While prosecutors have wide berth to advocate for their case, there are limitations. Specifically, prosecutors “should not seek to lead the jury away from the issues by drawing irrelevant and inflammatory conclusions which have a decided tendency to prejudice the jury against the defendant”
 
 (People v Ashwal,
 
 39 NY2d 105, 110).
 

 [19]
 

 . Reading the jury charge as a whole
 
 (People v Fields,
 
 87 NY2d 821, 823), we find no merit to the remainder of defendant’s claims concerning the trial court’s instructions. The instructions conveyed a correct statement of the law and there is no basis for concluding that the jury could not follow them
 
 (People v Coleman,
 
 70 NY2d 817, 819).
 

 [20]
 

 . All the parties agree that unanimity is required. Therefore we do not need to consider the People’s contention, raised only at trial, that unanimity may not be required to reject the affirmative defense of extreme emotional disturbance (see Donnino, Practice Commentary, McKinney’s Cons Laws of NY, Book 39, Penal Law § 25.00, at 111 [open question whether jury need be unanimous on finding that an affirmative defense has not been proven]).
 

 [21]
 

 . We know of no sound jurisprudential principle that supports the dissenter’s desire to determine the status of the People’s death notice on a retrial as part of this appeal. None of the parties to this appeal briefed this issue — none press for resolution of it now. That would require an advisory opinion in advance of a number of other procedural options in the new proceeding that might render the matter academic.
 

 [22]
 

 . Had the statute not been encumbered with a
 
 Jackson
 
 defect, defendant could have pressed his claims of error in the sentencing determination. This, of course, would have also called upon us to fulfill our unique appellate responsibilities under CPL 470.30 (3) in reviewing his claims and could have presented several different possible remedies.
 

 [23]
 

 . We need not reach defendant’s contention that New York’s capital punishment statute permits district attorneys to select capital defendants arbitrarily, inconsistently and diseriminatorily. CPL 250.40 authorizes the prosecutor to seek death as a sentence. Because the sentence is vacated, there is no need to address the viability of the statute at this time.
 

 [1]
 

 . The issue of when heightened scrutiny should be applied in death penalty cases has arisen in several cases, including the following:
 
 People v Mower,
 
 280 AD2d 25 (3d Dept 2001),
 
 affd
 
 97 NY2d 239 (2002);
 
 People v Reed,
 
 265 AD2d 56 (2d Dept 2000);
 
 People v Morgan,
 
 178 Misc 2d 621 (Fulton County Ct 1998);
 
 People v Arthur,
 
 175 Misc 2d 742 (Sup Ct, NY County 1997);
 
 People v Cajigas,
 
 174 Misc 2d 472 (Westchester County Ct 1997);
 
 People v Bastien,
 
 170 Misc 2d 103 (Sup Ct, NY County 1996);
 
 People v Rodriguez,
 
 168 Misc 2d 219 (Sup Ct, NY County 1996).
 

 [2]
 

 . Indeed this is in fact the prevailing view among New York trial courts that have addressed this issue (see
 
 People v Arthur,
 
 175 Misc 2d at 750 n 7 [providing a detailed synopsis of courts that have declined to apply heightened scrutiny at various stages of capital proceedings]). However, many courts of last resort have not adopted this view (see
 
 People v Cudjo,
 
 6 Cal 4th 585, 623, 863 P2d 635, 659, [1993],
 
 cert denied
 
 513 US 850 [1994] [“the Eighth Amendment imposes heightened reliability standards for both guilt and penalty determinations in capital cases * * *”];
 
 Snow v State,
 
 800 So 2d 472, 477 [Miss 2001],
 
 cert denied
 
 — US —, 122 S Ct 2299 [2002] [applying strict scrutiny to convictions and sentences, finding that “all bona fide doubts are to be resolved in favor of the accused because ‘what may be harmless in a case with less at stake becomes reversible error when the penalty is death’”];
 
 State v Martinez,
 
 132 NM 32, —, 43 P3d 1042, 1046 [2002] [“Because of the gravity and irrevocability of the death sentence, and the grave injustice that would accompany an erroneous execution, error in a capital case is more likely to rise to fundamental error than the same error in a non-capital case. In a capital case, a legal defense often represents the only lawful mechanism by which a defendant may preserve his or her life. Any error that encumbers that mechanism unfairly debilitates the defendant’s claim to life, magnifies the risk of an erroneous execution, and necessarily constitutes a circumstance that ‘shock(s) the conscience’ and ‘implicate(s) a fundamental unfairness within the system that would undermine judicial integrity if left unchecked.’
 
 Cunningham,
 
 2000-NMSC-009, ¶ 21, 128 N.M. 711, 998 P.2d 176. Thus, any error that impairs a defense against the death penalty, whether it arises from the sentencing or guilt phase of a capital trial, is, as a matter of law, fundamental”];
 
 Ice v Commonwealth,
 
 667 SW2d 671, 674 [Ky 1984],
 
 cert denied
 
 469 US 860 [“RCr 9.22 requires that, as a general rule, the defendant must object to the action of the trial court in order to preserve a claim of error. Appellant cites us to cases standing for the proposition that in a case where the death penalty has been imposed by the trial court an exception exists to this contemporaneous objection rule. These cases hold that in a death penalty case every prejudicial error must be considered, whether or not an objection was made in the trial court. As stated in
 
 Edwards v. Commonwealth,
 
 298 Ky. 366, 182 S.W.2d 948
 
 *499
 
 (1944), at p. 374, 182 S.W.2d 948: ‘(W)here the defendant’s life is at stake, technical rules of procedure must give way to the more lofty aim that justice may be done’”];
 
 State v Hamilton,
 
 478 So 2d 123, 127 n 7 [La 1985],
 
 cert denied
 
 478 US 1022 [1986];
 
 Commonwealth v McKenna, 476
 
 Pa 428, 441, 383 A2d 174, 181 [1978];
 
 Bishop v State,
 
 812 So 2d 934, 938 [Miss 2002] [“We review capital murder convictions where a sentence of death has been imposed with heightened scrutiny ‘under which all bona fide doubts are resolved in favor of the accused’”];
 
 Hooks v State,
 
 19 P3d 294 [Okla 2001],
 
 cert denied
 
 534 US 963;
 
 State v Moore,
 
 678 NE2d 1258 [Ind 1997] [guilty plea subject to strict scrutiny];
 
 State v Marshall,
 
 148 NJ 89, 148-149, 265, 690 A2d 1, 29-30, 89 [1997],
 
 cert denied
 
 522 US 850;
 
 but see People v Weaver,
 
 26 Cal 4th 876, 29 P3d 103 [2001],
 
 cert denied
 
 — US —, 122 S Ct 1920 [2002] [no authority for argument that heightened reliability governs admissibility of evidence at guilt phase];
 
 State v Benn,
 
 120 Wash 2d 631, 648, 845 P2d 289, 299 [1993] [en banc],
 
 cert denied
 
 510 US 944 [“(w)e review assignments of guilt phase error in capital cases no differently than in non-capital cases”]).
 

 [3]
 

 .
 
 See also Johnson v Mississippi,
 
 486 US 578 (1988) (defendant’s. Eighth Amendment rights violated by court’s denial of defendant’s postconviction relief from a death sentence in which the jury considered as an aggravating circumstance a conviction that was later ruled invalid);
 
 Caldwell v Mississippi,
 
 472 US 320 (defendant’s Eighth Amendment rights violated by prosecutor’s inaccurate and misleading comments, which led the sentencer to believe that the responsibility for determining the appropriateness of defendant’s death rests elsewhere);
 
 compare with California v Ramos,
 
 463 US 992 (1983) (instructions that the State Governor could commute a sentence of life imprisonment without possibility of parole into a lesser sentence that included the possibility of parole was constitutional since it was accurate and relevant to a legitimate state penological interest, namely, the possibility of future dangerousness).
 

 [4]
 

 . Like jurors in noncapital cases, jurors in capital cases must impartially “apply the law and find the facts”
 
 (Wainwright v Witt,
 
 469 US 412, 423 [1985]). Thus, prospective jurors who would automatically vote against or in favor of the death penalty, regardless of mitigating or aggravating factors, must be excluded for cause since they clearly are not able to impartially apply the law to the facts (see
 
 Morgan v Illinois,
 
 504 US 719, 729 [1992]). In other words, that juror’s view would prevent the juror from carrying out the performance of his or her duty to impartially apply the law and find the facts (see
 
 Wainwright,
 
 469 US at 423). Such a juror is unable to carry out the duty to consider virtually all of the mitigating circumstances offered by defendant (see
 
 Lockett v Ohio,
 
 438 US at 597-609). Similarly, a juror whose views in favor of or against the death penalty would substantially impair the performance of his or her duty to impartially apply the law to the facts should also be excluded for cause
 
 (id.).
 
 However, a juror who expresses conscientious objections to capital punishment
 
 (Witherspoon v Illinois,
 
 391 US 510), or for whom the possible imposition of the death sentence would or might affect their deliberation
 
 (Adams v Texas,
 
 448 US 38, 44-45 [1980]), is not necessarily unable to carry out the duty to impartially apply the law and find the facts.
 

 [5]
 

 . Each amendment independently guarantees an impartial jury
 
 (see Turner v Louisiana,
 
 379 US 466, 472 n 10 [1965]).
 

 [6]
 

 . Currently, the Committee on the Judiciary of the United States Senate and a subcommittee of the Committee on the Judiciary of the House of Representatives are reviewing the application of the death penalty in America. The Governors of Illinois
 
 (see
 
 Executive Order Creating the Governor’s Commission on Capital Punishment, No. 4 [May 12, 2000], 24 Ill Reg 7439) and Maryland
 
 (see
 
 May 9, 2002 official press statement of Governor Parris N. Glendening, <www.gov.state.md.us/gov/press/2002/may/html/ baker,html> [staying execution of Wesley Eugene Baker and all other executions pending the results of a “two-year study by the University of Maryland examining the effects of racial and jurisdictional factors on the imposition of the death penalty”]) have suspended the application of the death penalty pending a review of its fairness in those states.
 

 [7]
 

 . Columbia University School of Law,
 
 A Broken System: Error Rates in Capital Cases, 1973-1995,
 
 <www.law.columbia.edu/instructionalservices/ liebman/index.html> (accessed June 17, 2002).
 

 [8]
 

 . Includes reversals from 1973 to April 2000
 
 (id.
 
 at 132 n 45).
 

 [9]
 

 . Clark also mentioned that the results of the Minnesota Multiphasic Personality Inventory (MMPI-2), a personality test administered by Drob, were normal, “but [that] he had 12 other tests.” Much later, Clark testified that “both Doctor Martel [l]’s and especially Doctor Drob’s psychiatric testing shows that this is a person who struggles with emotions and pushes them down * *
 

 [10]
 

 . Another diagnosis that was essential was child abuse, which, according to Clark, was documented.
 

 [11]
 

 . The intent is evidenced by the wording of the statute that CPL 260.30 replaced, which provided in relevant part:
 

 “4. The defendant or his counsel may then offer the evidence in support of his defense;
 

 “5. The parties may then, respectively, offer rebutting testimony, but the court, for good reason, in furtherance of justice, may permit them to offer evidence upon their original case” (former Code Grim Pro § 388 [4], [5]).
 

 [12]
 

 . GPL 270.20 (2) provides as follows: “All issues of fact or law arising on the challenge must be tried and determined by the court. If the challenge is allowed, the court must exclude the person challenged from service. An erroneous ruling by the court allowing a challenge for cause by the people does not constitute reversible error unless the people have exhausted their peremptory challenges at the time or exhaust them before the selection of the jury is complete. An erroneous ruling by the court denying a challenge for cause by the defendant does not constitute reversible error unless the defendant has exhausted his peremptory challenges at the time or, if he has not, he peremptorily challenges such prospective juror and his peremptory challenges are exhausted before the selection of the jury is complete.”
 

 This statute is consistent with the law of a number of other states:
 
 State v Carmouche,
 
 2002 WL 984306, *8, 2002 La LEXIS 1520, *12 (La Sup Ct, May 14, 2002);
 
 State v Good,
 
 309 Mont 113, 128, 43 P3d 948, 960 (2002);
 
 Green v Maynard,
 
 349 SC 535,542-543,564 SE2d 83,86-87 (2002);
 
 State vRoseboro,
 
 351 NC 536, 544, 528 SE2d 1, 7 (2000),
 
 cert denied
 
 531 US 1019;
 
 People v Bolin,
 
 18 Cal 4th 297, 314-315, 956 P2d 374, 386 (1998),
 
 cert denied
 
 526 US 1006 (1999);
 
 State v Barone,
 
 329 Or 210, 227, 986 P2d 5, 18 (1999),
 
 cert denied
 
 528 US 1086 (2000);
 
 Evans v State,
 
 725 So 2d 613, 652 (Miss 1997),
 
 cert dismissed
 
 525 US 1133 (1999);
 
 State v Hart,
 
 691 So 2d 651, 656 (La 1997);
 
 State v Robertson,
 
 630 So 2d 1278, 1280-1281 (1994);
 
 Garcia v State,
 
 887 SW2d 846, 852 (Tex 1994) (en banc),
 
 cert denied
 
 514 US 1005 (1995);
 
 People v Prator,
 
 856 P2d 837, 842 (Colo 1993) (en banc);
 
 People v Johnson,
 
 3 Cal 4th 1183, 1210-1211, 842 P2d 1, 12 (1992),
 
 cert denied
 
 510 US 836 (1993);
 
 People v Macrander,
 
 828 P2d 234, 244 (Colo 1992) (en banc);
 
 Narvaiz v State,
 
 840 SW2d 415, 427 (Tex 1992) (en banc),
 
 cert denied
 
 507 US 975 (1993);
 
 Trotter v State,
 
 576 So 2d 691, 693 (Fla 1990);
 
 State v Heald,
 
 443 A2d 954, 956 n 4 (Me 1982);
 
 State v Albano,
 
 119 Me 472, 473-474, 111 A 753, 753 (1920);
 
 Rodriguez v State,
 
 816 So 2d 805, 806-807 (Fla 2002).
 

 [13]
 

 . In 1968, the Federal Kidnaping Act provided, in pertinent part: “Whoever knowingly transports in interstate ** * * commerce, any person who has been unlawfully * * * kidnaped * * * and held for ransom * * * or otherwise * * * shall be punished (1) by death if the kidnaped person has not been liberated unharmed, and if the verdict of the jury shall so recommend, or (2) by imprisonment for any term of years or for life, if the death penalty is not imposed” (18 USC § 1201 [a] [reprinted in History; Ancillary Laws and Directives, Amendments, following 18 USCS § 1201 (Lawyers Cooperative 1994 ed)]).
 

 [14]
 

 . CPL 220.10 (5) (e) and 220.30 (3) (b) (vii) provided: “A defendant may not enter a plea of guilty to the crime of murder in the first degree as defined in section 125.27 of the penal law; provided, however, that a defendant may enter such a plea with both the permission of the court and the consent of the people when the agreed upon sentence is either life imprisonment without parole or a term of imprisonment for the class A-I felony of murder in the first degree other than a sentence of life imprisonment without parole.”
 

 CPL 220.60 (2) (a) provides:
 
 “A
 
 defendant who has entered a plea of not guilty to an indictment may, with both the permission of the court and the consent of the people, withdraw such plea at any time before the rendition of a verdict and enter: (a) a plea of guilty to part of the indictment pursuant to subdivision three or four but subject to the limitation in subdivision five of section 220.10.”