OPINION OF THE COURT
Richter, J.
The facts of this case are largely undisputed. On the morning of July 16, 2009, the decedent was found stabbed to death in his car in upper Manhattan. Although the police initially believed he had fallen prey to a violent robbery, they later discovered that he had traveled to Manhattan for the express purpose of finding someone to kill him. Because of mounting financial troubles, the decedent had devised a plan to end his life so that his family could receive his life insurance proceeds.
The evidence at trial consisted primarily of defendant’s statement to the police made after his arrest. Defendant told the police that he met the decedent on a street in upper Manhattan. The decedent invited defendant into his car, told defendant about his financial problems and asked defendant to kill him. The decedent explained that it needed to look like a robbery so his family could get the life insurance benefits. The decedent told defendant to open up the glove compartment where defendant saw a knife. The decedent instructed defendant to hold the knife against the steering wheel with the blade facing the decedent. The decedent then leaned forward into the knife sev *201 eral times, told defendant to move the knife over, and the decedent leaned forward into the knife a couple of more times. At that point, the decedent was alive, and defendant left the car.
At trial, both the People and the defense agreed that the decedent sought defendant’s assistance to help him accomplish his goal of ending his life and making it look like he was killed. The only real dispute involved the manner in which the knife wounds were inflicted. The People’s medical expert testified that the nature of the decedent’s wounds was inconsistent with defendant’s account, and that it was defendant who stabbed the decedent. To counter this evidence, the defense presented expert testimony from a forensic pathologist who testified that he could not rule out the possibility that the decedent had impaled himself on a knife held by defendant against the steering wheel.
Prior to deliberations, the trial court instructed the jury on the elements of murder in the second degree. With no objection from the People, the court also charged the affirmative defense of assisted suicide.[1] A person is guilty of murder in the second degree when “[w]ith intent to cause the death of another person, he causes the death of such person” (Penal Law § 125.25 [1]). The statute further provides that “it is an affirmative defense that . . . defendant’s conduct consisted of causing or aiding, without the use of duress or deception, another person to commit suicide” (Penal Law § 125.25 [1] [b]). The standard criminal jury instruction (CJI) mirrors the words of the statute (see CJI2d[NY] Penal Law § 125.25 [1] [b]).
In its final instructions, the court went substantially beyond the statutory language and the CJI charge, telling the jury that:
“If the defendant intentionally aided [the decedent] in taking his own life or if the defendant encouraged or advised [the decedent] to take his own life, that’s assisted suicide.
“However, if the defendant actively caused [the decedent’s] death even with [the decedent’s] consent, then that’s not assisted suicide because the consent of the victim is not a defense to murder” (emphasis added).
*202 During deliberations, the jury sent out a note asking for the definition of the word “active.” Defendant, who had objected to the wording of the original charge, and in particular to the passive-active distinction created by the court, objected to further defining the term. Defendant instead asked the court to simply read the standard CJI charge, which had been defendant’s position when the charge was first given. The court rejected defendant’s request, and instructed the jury that “active” means “[djoing something, carrying out an actual process, or carrying out by involvement, energy or action.”
On appeal, defendant’s principal argument is that the court’s initial and supplemental charges misstated the law on the assisted suicide affirmative defense. “In considering a challenge to a jury instruction, the ‘crucial question is whether the charge, in its entirety, conveys an appropriate legal standard and does not engender any possible confusion’ ” (People v Hill, 52 AD3d 380, 382 [1st Dept 2008], quoting People v Wise, 204 AD2d 133, 135 [1st Dept 1994], lv denied 83 NY2d 973 [1994]). Where the court’s charge creates undue confusion in the minds of the jurors, reversal is warranted (Hill, 52 AD3d at 382; People v Rogers, 166 AD2d 23 [1st Dept 1991], lv denied 78 NY2d 1129 [1991]). Moreover, “each time a judge declines to employ the carefully thought-out measured tone of the standard jury charge in favor of improvised language, an additional risk of reversal and a new trial is created” (Hill, 52 AD3d at 382 [internal quotation marks omitted]). Thus, “the better practice for the trial courts is, when feasible, to utilize the charges contained in the Criminal Jury Instructions” (People v King, 85 AD3d 412, 413 [1st Dept 2011], lv denied 18 NY3d 925 [2012]).
Guided by these principles, we believe that the court’s charge was error. The trial presented two starkly different scenarios of the decedent’s death. Under the People’s version, defendant stabbed the decedent as he lay prone in the seat of his car. Under defendant’s version, the decedent impaled himself on a knife held by defendant. We agree with the People that their version, if accepted, would constitute murder, not assisted suicide. If the decedent took no part whatsoever in the ultimate act that led to his death, it cannot be characterized as suicide, even if the record shows the decedent wanted to die. In this regard, we find that the jury’s verdict convicting defendant of murder was based on legally sufficient evidence and was not *203 against the weight of the evidence (see People v Danielson, 9 NY3d 342, 348-349 [2007]). The testimony of the People’s medical expert provided ample proof that defendant repeatedly stabbed the decedent. Based on this evidence, the jury was entitled to reject defendant’s claim that he merely held the knife.
But the jury was also free to accept defendant’s account of events. Under that version, a jury could have found that the decedent committed suicide because he committed the final overt act that caused his death, i.e., thrusting himself into the knife. Notably, the People did not argue below that defendant’s version, if believed, would not satisfy the affirmative defense to murder. In fact, the record shows that the People acquiesced to the defense being charged, and they do not argue otherwise on appeal. The People made no objection to the charge, and in fact offered their own proposed language to the court. The trial court determined that defendant’s version supported the assisted suicide defense because it decided to give the charge (see People v Taylor, 80 NY2d 1, 12 [1992] [“court must charge the jury on any claimed defense that is supported by a reasonable view of the evidence”]).
Under these circumstances, the portion of the court’s instruction that the assisted suicide defense is not made out if defendant “actively” caused the decedent’s death, along with the expansive definition of the word “active” given in the supplemental charge, was confusing and conveyed the wrong standard. Neither the word “active,” nor its antonym “passive,” appears in the statutory language and thus, by giving this charge, the court added an element that is not part of the defense. Moreover, although sparse, the legislative history of the current statute supports the view that the assisted suicide defense allows for at least some “active” assistance to one who commits suicide. The affirmative defense of assisted suicide was added as part of the 1965 overhaul of the Penal Law. As originally proposed by the Commission on Revision of the Penal Law and Criminal Code, the statute defined the assisted suicide defense as “causing or aiding a suicide . . . [without the use of] force, duress or deception” (Staff Notes of Temp St Commn on Rev of Penal Law and Crim Code, 1964 Proposed NY Penal Law [Study Bill, 1964 Senate Intro 3918, Assembly Intro 5376] § 130.25 [1] [b] at 76-77 [emphasis added]). Thus, under the proposed law, a person who used force, duress or deception in aiding a suicide could still be prosecuted for murder. In enacting the current *204 statute, the legislature rejected the Commission’s proposal and removed the word “force,” retaining only the phrase “without the use of duress or deception” (Penal Law § 125.25 [1] [b]). Although the legislative history is silent as to why the word “force” was removed, it suggests that the legislature contemplated some active conduct within the scope of the assisted suicide defense.
Likewise, the fact that assisted suicide exists as an affirmative defense to murder shows that active conduct could be included in the defense. The jury was required to consider the affirmative defense only upon finding that defendant intentionally caused the decedent’s death, which necessarily means that defendant engaged in some active conduct that caused the death. But the court’s instruction advised the jury that if defendant actively caused the decedent’s death, he was not entitled to the affirmative defense. Such a circular instruction was confusing, and could have led the jury to conclude that if they found intentional murder, the affirmative defense was not applicable. By using the phrase “actively caused,” the court effectively thwarted the affirmative defense and mandated a directed verdict of guilt.
The court’s error was compounded by its overly broad definition of the term “active.” The court told that jury that “active” meant “[djoing something, carrying out an actual process, or carrying out by involvement, energy or action.” The affirmative defense exists to protect from murder charges those who assist others to commit suicide. A person obviously cannot provide assistance to one committing suicide without “doing something.” Under this expansive definition, the jury might well have believed that any of defendant’s actions, under his version of events, constituted “actively causing” the decedent’s death.[2] Thus, the jury could have been confused into thinking that defendant’s taking the knife out of the glove compartment, or holding the knife, would constitute murder and not assisted suicide, a position the People did not take at trial.
We disagree with the People’s assertion that the words of the statute lacked sufficient guidance. There is nothing confusing or unclear about the words “aiding . . . another person to *205 commit suicide.” The ordinary meaning of the term “aid” is to help or assist and encompasses both active and passive assistance. And where the language of a statute is plain, courts should “construe words of ordinary import with their usual and commonly understood meaning” (Rosner v Metropolitan Prop. & Liab. Ins. Co., 96 NY2d 475, 479 [2001]; see McKinney’s Cons Laws of NY, Book 1, Statutes § 94). By adding words not chosen by the legislature, the court effectively rewrote the statute, and imposed a greater burden on defendant than the statute required. Moreover, if the jury needed additional guidance after being given the standard charge, it could have requested it.
The People do not argue that the error here was harmless nor could such an argument be made because defendant’s entitlement to the affirmative defense was the central issue at trial. Under the circumstances, the error in the court’s charge, which was objected to, resulted in significant prejudice to defendant because it essentially gutted his defense (see People v Soriano, 36 AD3d 527, 529 [1st Dept 2007] [error in charge not harmless where point at issue went to the heart of the proffered defense]).
The court properly denied defendant’s motion to dismiss the indictment and order the People to resubmit the case to a new grand jury on the basis of evidence discovered after the indictment was filed. CPL 190.75 (3), upon which defendant relies, authorizes resubmission only when the grand jury has dismissed a charge. Since no charge was dismissed by the grand jury, CPL 190.75 (3) is inapplicable.
To the extent defendant argues that the People should have charged the grand jury on the assisted suicide affirmative defense, that claim is unpreserved. In his letter-motion seeking to compel the People to resubmit the case, defendant asked only that a second grand jury consider charges of manslaughter in the second degree and promoting a suicide attempt. Defendant never asked that a new grand jury be instructed on the affirmative defense of assisted suicide. We decline to reach the issue in the interest of justice because even defendant acknowledges in his appellate brief that, at the time of the grand jury presentation, his account “seemed farfetched and self-serving.”
As an alternative holding, we would reject defendant’s claim on the merits. Even if defendant’s statement to the police could be read as supporting the assisted suicide affirmative defense, the People had no obligation to instruct the grand jury on that defense. It is well-settled that a prosecutor is not *206 required to present mitigating defenses to a grand jury (People v Harris, 98 NY2d 452, 475 [2002]; People v Valles, 62 NY2d 36, 38-39 [1984]). Whether or not a particular defense should be charged “depends upon its potential for eliminating a needless or unfounded prosecution” (Valles, 62 NY2d at 38). “Unlike exculpatory defenses, which may result in a finding of no criminal liability, mitigating defenses only reduce the gravity of the offense committed” (Harris, 98 NY2d at 475; accord Valles, 62 NY2d at 39). Here, even if defendant’s statement satisfied the affirmative defense, it would not eliminate a “needless or unfounded prosecution,” but instead would warrant prosecution for the manslaughter crime of assisted suicide (see Penal Law § 125.15 [3] [defining manslaughter as intentionally causing or aiding another person to commit suicide]).
In concluding that the conviction should be reversed, we recognize that the manner in which the decedent died is disturbing. But the People, at trial and on appeal, acknowledge that the decedent was looking for someone to help him end his life, and this appeal does not raise the question of whether the assisted suicide charge should have been given at all. Nor is there any support in the statutory language or case law for the People’s view that the assisted suicide defense applies only to sympathetic situations. It is the role of the jury, not this Court, to determine whether defendant’s or the People’s version is the correct one, and whether the defense is borne out by the evidence. Because the jury’s decision must be based on a proper legal instruction, a new trial is warranted.
In light of our decision to reverse the judgment, we need not reach defendant’s claim that the trial court unduly limited his direct examination of the defense expert witness.
Accordingly, the judgment of the Supreme Court, New York County (Carol Berkman, J.), rendered April 4, 2011, convicting defendant, after a jury trial, of murder in the second degree, and sentencing him to a term of 20 years to life, should be reversed, on the law, and the matter remanded for a new trial.
Gonzalez, P.J., Sweeny and Clark, JJ., concur.
Judgment, Supreme Court, New York County, rendered April 4, 2011, reversed, on the law, and the matter remanded for a new trial.

. At the charge conference, the court initially expressed some doubts about whether it should give the affirmative defense charge, but agreed to do so because “the People are really jumping up and down.” Thus, the record supports the conclusion that the People fully agreed with the decision to charge the defense.

. The broad definition given by the court in its supplemental charge could cover conduct such as opening a bottle of pills for a terminally ill family member since such conduct would fall within the phrase “carrying out an actual process.” Yet this is exactly the type of situation the People suggest the defense was intended to cover.